Anna Jones, Appellee, v. Walgreen Company, Appellant.

Gen. No. 35,398.

Heard in the second division of this court for the first district at the October term, 1931.

Opinion filed February 23, 1932.

CHURCH, HAFT, ROBERTSON, CROWE & SPENCE, for appellant; BURT A. CROWE and EGBERT ROBERTSON, of counsel.

ROYAL W. IRWIN, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Anna Jones, plaintiff, sued Walgreen Company, a corporation, in case. There was a trial before the court, with a jury, and a verdict returned finding the defendant guilty and assessing the plaintiff's damages at the sum of $20,000. Judgment was entered on the verdict and the defendant has appealed.

The declaration alleges that on July 13, 1929, the defendant was engaged in the manufacture, sale and distribution of drugs, and maintained divers drug stores wherein it sold to the public divers drugs, and employed in and about the operation, management, sale and distribution of the drugs in said drug stores divers druggists and pharmacists; that on the day aforesaid "the plaintiff presented to the defendant a certain prescription of a duly registered and licensed physician and surgeon of Cook County, Illinois, for certain drugs to be then and there taken by the plaintiff internally for the purpose of curing a certain malady, and the plaintiff requested the defendant by means of such prescription, to sell, furnish and compound the drugs, medicines prescribed thereby, but that the defendant did then and there carelessly, negligently and unlawfully substitute or cause to be substituted therefor, without notification to the plaintiff, other drugs, medicines, chemicals and pharmaceutical preparations; that thereafter the plaintiff did, in the exercise of ordinary care for her own safety, without notice of said substitution, take and consume internally said drugs, medicines, chemicals and pharmaceutical preparations so substituted by the defendant, and by

reason thereof, the plaintiff then and there became and has so remained from thence hitherto, sick . . .; all of which injuries plaintiff says are permanent and lasting,'' to the damage of the plaintiff in the sum of $25,000. The defendant filed a plea of the general issue.

On July 13, 1929, the plaintiff was suffering from a dull pain in her arm and the family physician, Dr. Markiewicz, was called. He diagnosed her ailment as muscular rheumatism and gave her a prescription, which read, "Strontium Salicylate four ounces (Wyatt), teaspoonful in water four times a day,'' signed "S. Markiewicz Registry No. 6379.'' The plaintiff's son-in-law left the prescription with a clerk in the defendant's drug store about noon and was told to call later for the medicine. During the afternoon he called for the medicine and was again told to call later. About 7 p. m. he called at the drug store and was given a bottle containing a drug in powder form. It is agreed that the prescription was filled with pure strontium salicylate prepared by Parke-Davis & Company. The plaintiff took a dose of the medicine about 7 p. m. and in less than half an hour she become very sleepy and went to bed. She felt extremely tired and had a buzzing in her ears. During the course of the night her son administered to her three additional doses of the medicine. Her drowsiness and sleepiness increased, her breathing became slow and labored and her pulse slow. She could not be aroused and seemed to be in a state of coma. When Dr. Markiewicz saw her the following morning she was cold and clammy and in a state of coma. Her respiration was depressed. Dr. Markiewicz prescribed hot coffee, hot lemonade and frequent drinks of water, for the purpose of eliminating the drug. The plaintiff, according to testimony offered in her behalf, appears to have been unconscious for about two days. She testified that when she finally became conscious she could neither see nor hear; that

the pressure in her head was terrible and she had great difficulty in breathing; that she felt like "stretching" her "body to pieces just for one good breath." She had a severe pain across her back. There was a buzzing noise in her ears. She had violent fits of nausea and vomiting, which continued for a considerable time. A severe diarrhea ensued. For a period of 36 hours after taking the drug there was a complete suppression of urine.

Testimony for the plaintiff shows that strontium salicylate "is a combination formed by combining strontium with salicylic acid. Strontium is a metal, we call it a metal, very much like calcium. . . . It belongs in the same family chemically and is used much in the same way that lime is used in medicine, especially as a salicylate, carbonate, and so on. . . . Salicylic acid is an acid found in some plants. . . . They also can prepare it from coal tar products. It is used especially in the treatment of rheumatism," and when given in reasonable doses it is not dangerous. Physicians prescribe 60 grains a day, "even sometimes 100." Over 60 grains a day is a large dose. "Anything over 100 grains is dangerous, likely to . . . cause vomiting, produce sweating, ringing in the ears, disturbance of vision, maybe collapse, nephritis, even death. . . . *Pure salicylate is used as a corn cure, directly applied to corns."* It cures a corn *by eating away the tissue and softening it. A large does in the stomach produces the same effect.* "By irritating the stomach it causes vomiting; going into the intestines it causes diarrhea in the same way by irritation." It is absorbed into the blood and into the nervous system. "It causes ringing in the ears, disturbance of vision, also dilates the blood vessels so that you get the blood vessels of the ears and eyes dilated. Sweating is caused because it injures the heart, drops blood pressure, and in that way a combination of the whole can produce death with excessive doses." It depresses

the nervous system. It is excreted mainly by the kidneys and when it is passing through them in large doses it irritates them and causes suppression of the urine, "and may cause nephritis, that is inflammation of the kidney." It causes the kidneys to swell and may permanently injure them. Plaintiff's proof also shows that the plaintiff, after she had taken four heaping teaspoonfuls of the prescription, had received into her system, within 16 hours, 720 grains of the pure strontium salicylate. There are certain "pharmaceutical manufacturing companies" in the United States which are well known to all pharmacists. John Wyeth & Brother, Parke-Davis & Company, Merck, Squibb and Lilly are in this class. It is undisputed that *John Wyeth & Brother do not manufacture pure strontium salicylate and that Parke-Davis & Company is the only company that manufactures it.* John Wyeth & Brother manufacture an effervescent strontium salicylate compound, which contains, in a heaping teaspoonful, 5 grains strontium salicylate, 5 grains ammonium strontium salicylate, 2 grains lithium bitartrate, and the rest effervescent alkalines. The Wyeth compound is composed of 10 per cent of strontium salicylate "and the rest is something filled in," and it is so harmless that it may be sold over the counter, without a prescription. A teaspoonful of the pure strontium salicylate is 10 or 12 times as powerful as a teaspoonful of the Wyeth preparation. Dr. McGuigan, a witness for the plaintiff, testified that "an overdose of strontium salicylate will poison very frequently"; that he had "seen lots of cases of salicylate poisoning in the hospitals." Dr. Markiewicz, a witness for the plaintiff, testified that strontium salicylate "is very seldom used on account of its toxicity. The effect it has upon the organs of the body."

In *Tremblay v. Kimball,* 107 Me. 53, 77 Atl. 405, the Supreme Court of Maine said (pp. 407–8):

"Finally, in applying his knowledge and exercising care and diligence, the druggist is bound to give his patrons the benefit of his best judgment; for even in pharmacy there is a class of cases in which judgment and discretion must or may be exercised. The druggist is not necessarily responsible for the results of an error of judgment which is reconcilable and consistent with the exercise of ordinary skill and care. He does not absolutely guarantee that no error shall ever be committed in the discharge of his duties. It is conceivable that there might be an error or mistake on the part of a qualified druggist which would not be held actionable negligence. *Patten v. Wiggin,* 51 Me. 596, 81 Am. Dec. 593; *Leighton v. Sargent,* 27 N. H. 460, 59 Am. Dec. 388; *Small v. Howard,* 128 Mass. 131, 35 Am. Rep. 363. As to druggists, see *Thomas v. Winchester,* 6 N. Y. 397, 57 Am. Dec. 455; *Norton v. Sewall,* 106 Mass. 143, 8 Am. Rep. 298; *McDonald v. Snelling,* 14 Allen (Mass.) 290, 92 Am. Dec. 768; *Brown v. Marshall,* 47 Mich. 576, 11 N. W. 392, 41 Am. Rep. 728.

"But while, as has been seen, the legal measure of the duty of druggists towards their patrons, as in all other relations of life, is properly expressed by the phrase 'ordinary care,' yet it must not be forgotten that it is 'ordinary care' with reference to that special and peculiar business. In determining what degree of prudence, vigilance, and thoughtfulness will fill the requirements of 'ordinary care' in compounding medicines *and filling prescriptions,* it is necessary to consider the poisonous character of so many of the drugs with which the apothecary deals, and the grave and fatal consequence which may follow the want of due care. In such a case 'ordinary care' calls for a degree of vigilance and prudence commensurate with the dangers involved. The general customer ordinarily has no definite knowledge concerning the numerous medicines and poisons specified in the 'U. S. Dispensa-

tory and Pharmacopoeia,' which registered apothecaries are by our statutes expressly allowed to keep, but must rely implicitly upon the druggist who holds himself out as one having the peculiar learning and skill and conceptions of legal duty necessary to a safe and proper discharge of that duty. 'Ordinary care' with reference to the business of a druggist must therefore be held to signify the highest practicable degree of prudence, thoughtfulness, and vigilance and the most exact and reliable safeguards consistent with the reasonable conduct of the business in order that human life may not constantly be exposed to the danger flowing from the substitution of deadly poisons for harmless medicine. As observed by Judge Cooley in *Brown v. Marshall,* 47 Mich. 576, 11 N. W. 392, 41 Am. Rep. 728: 'The case, it must be conceded, is one in which a very high degree of care may justly be required. People trust not merely their health, but their lives, to the knowledge, care, and prudence of druggists, and in many cases a slight want of care is liable to prove fatal to some one. It is therefore proper and reasonable that the care required shall be proportioned to the danger involved.' *Maxfield v. Railroad Co.,* 100 Me. 80, 60 Atl. 710, and cases cited. *Raymond v. Railroad Co.,* 100 Me. 531, 62 Atl. 602, 3 L. R. A. (N. S.) 94." (Italics ours.)

In 29 L. R. A. (N. S.) 900, in the note to the above case, it is said:

"There is no conflict of authority as to the duty required of a druggist in his dealings with his customers. *All the decisions support the principle enunciated in Tremblay v. Kimball,* that while the law requires of a druggist only reasonable and ordinary care in compounding prescriptions, in selling medicines, and in performing the other duties of his profession, such care with reference to him means the highest degree of prudence, thoughtfulness, and diligence, and is pro-

portioned to the danger involved; and that a breach of such duty would be negligence rendering him liable for injuries resulting therefrom.'' (Italics ours.)

In support of this statement many cases are cited. (See also *Tombari v. Connors,* 85 Conn. 231, 234–6; *McGahey v. Albritton,* 214 Ala. 279, 107 So. 751; *Brown v. Marshall,* 47 Mich. 576, 583 (opinion by Cooley, J.); *Martin v. Manning,* 207 Ala. 360, 92 So. 659, 660; *Faulkner v. Birch,* 120 Ill. App. 281, 284–5.)

Cahill's Ill. Rev. St. ch. 91, ¶ 65, provides, *inter alia*:

''Nor shall any druggist or other person being requested by means of prescription, or in any manner, to sell, furnish or compound any drug, medicine, chemical or pharmaceutical preparation, substitute or cause to be substituted therefor, without notification to the purchaser, any other drug, medicine, chemical or pharmaceutical preparation.

''Any person violating any provision of this section upon conviction shall be liable to all the costs of the action and all the expenses incurred by the State Board of Pharmacy in connection therewith, and for the first offense shall be fined not less than ten dollars nor more than one hundred dollars, and for each subsequent offense shall be fined not less than seventy-five dollars nor more than one hundred and fifty dollars.''

Maurice Zaritsky, a clerk for the defendant, who filled the prescription on July 13, 1929, was then about 22 years of age. He had graduated in pharmacy the previous month. He was not registered and licensed as a regular pharmacist until September, 1929. The following appears from his testimony: ''That prior to July 13, 1929, he had passed the State Board examination for the position of assistant registered pharmacist; that he was familiar with the principal pharmaceutical manufacturers, including Parke-Davis & Company and John Wyeth & Brother; that doctors sometimes indicated on their prescriptions P-D for Parke-

Davis & Company, and Wyeth for John Wyeth & Brother; that he knew that Wyeth did not make strontium salicylate; that the defendant had in stock strontium salicylate made by Parke-Davis & Company, and also effervescent strontium salicylate made by John Wyeth & Brother; that when he received the prescription to fill he "dispensed four ounces of strontium salicylate" from the "stock bottle probably Parke-Davis & Company's"; that before he filled the prescription he saw on it the word "Wyatt" but "it didn't mean very much to me, *it seemed to indicate the doctor had in mind a brand of strontium salicylate"*; that he looked in the "red book" to see if there was a manufacturer by the name of Wyatt but did not find one; that there is no manufacturer with a name that sounds like Wyatt; *that Wyatt sounds like Wyeth "if you slur it";* that "when you get a prescription and you don't know what it means" you call up the doctor; that he did not examine the catalogue of Wyeth & Brother; that he knew that Wyeth made an effervescent strontium salicylate compound and that "Wyeth doesn't make strontium salicylate." The manager of the defendant's store testified that it is the custom and practice in the drug trade and of registered pharmacists to give the drug of the pharmaceutical house called for; that physicians use the names "Parke-Davis, Wyeth, Squibb," "right often," and that when Dr. Markiewicz spoke to him about the prescription on July 14 it "flopped" into his mind that the word Wyatt on the prescription meant John Wyeth & Brother; that doctors sometimes think that the product of a certain manufacturer is better than the product of another and that *"one manufacturer may use one preparation and another one another including different ingredients,"* and that "for that reason they very often specify some particular pharmaceutical manufacturer" and that it is the duty of the druggist to follow the prescription in that regard.

Emanuel A. Novak, pharmacist, a witness for the defendant, testified that he was familiar with the drug known as strontium salicylate and also with the drug manufactured by John Wyeth & Brother called effervescent strontium salicylate. When cross-examined as to what he would understand the word "Wyatt" on a prescription to mean, he answered, "Well, I would say probably it would mean John Wyeth & Bro. or Sons." The witness was further cross-examined as follows: "Q. If you were filling this prescription wouldn't you find out? A. Surely. Q. You would find out? A. Yes. Q. And if you found that this effervescent strontium salicylate was the only one made by Wyeth and this prescription contains strontium salicylate Wyatt there might be a question in your mind as to whether this was called for or something else? A. Well, there is a question in every prescription. Q. There is a question in every prescription? A. Yes. Q. Why is there a question in every prescription? A. Sometimes it isn't definitely written or definitely prescribed. . . . Q. When you can't read a prescription correctly you take chances and consult the pharmacopoeia to see? A. *If we can't read it correctly we call the doctor.* . . . Q. *Is there a strontium salicylate Wyatt? A. No. Q. There is not. Then it couldn't be filled according to the prescription?* A. The manufacturer doesn't— *Q. It could not be filled according to the prescription? A. Say so, if you want to.* . . . Q. This calls for strontium salicylate manufactured by Wyatt. A. There isn't such a manufacturer according to the spelling of the prescription there. . . . A. There isn't such a manufacturer as Wyatt. . . . Q. If you received this prescription over the desk in your drug store you would know what was meant by that, wouldn't you? A. Not necessarily." Frank Hassett, pharmacist, a witness for the defendant, testified, on direct, that it was the custom and usage in the trade

of a registered pharmacist "in regard to prescriptions . . . to fill them as they are written"; *that the word "Wyatt" on the prescription in question "would mean that the doctor was trying to specify a certain brand of make."* Upon cross-examination the following occurred: "Q. *Suppose that prescription came to you, what would you take the word (Wyatt) to mean? A. Probably meant Wyeth. Q. Wyeth & Bro.? A. Wyeth & Bro. Q. Pharmaceutical manufacturers, are they? A. Yes, sir. Q. That is what you would take it for, wouldn't you? A. Yes, sir.*" This witness further testified that he knew that John Wyeth & Brother did not make strontium salicylate; that he would not sell a patient anything the doctor did not prescribe; that when a doctor made a mistake in the prescription he called him up and asked him about the prescription; that it is the duty of a pharmacist to fill a prescription exactly as called for; that when a doctor prescribes Wyeth, Parke-Davis or any other proprietary pharmaceutical manufacturer's preparation it is the duty of the pharmacist to follow the prescription; that the doctor evidently made a mistake in the prescription. "Q. Have you a right when a doctor prescribes a particular kind of drug, when you find the doctor has made a mistake, to substitute something else in place of that? A. No." George W. Funck, physician, a witness for the defendant, testified *that the name "Wyatt" on the prescription indicated to him that the physician referred to some particular manufacturer of strontium salicylate;* that Wyeth's effervescent strontium salicylate is only one-tenth as strong as pure strontium salicylate; that when, on a prescription, the name of a pharmaceutical manufacturing company appears, "it means that the prescriber has a preference for that particular make, he designates that make, that manufacture"; that when a doctor has prescribed an overdose it is the duty of the pharmacist to refuse to

fill the prescription. A. C. Tenney, a physician, a witness for the defendant, admitted that when he prescribed a drug made by a certain pharmaceutical company he wanted that drug. "I don't call for anything else than that. That is the reason for taking your prescription. If I call for Parke-Davis I don't want Lilly."

The defendant contends that "the legal duty of a druggist to a purchaser can go no further than to dispense the identical substance which his prescription calls for." No authority is cited by the defendant in support of this contention. In its brief it states: "We have searched the books and have been unable to find a case similar to the one at bar." The instant contention is primarily based upon the assumption that a pharmacist is obliged to fill any and all prescriptions. Such is not the law. As a chemist he may know that the physician has erred in his prescription and that to fill it might cause death or serious injury to the patient. The argument interposed, briefly stated, is this, that the proof shows that there was no such pharmaceutical manufacturer as Wyatt and that therefore Zaritsky, who filled the prescription, had the right to disregard the word Wyatt and to fill the prescription with pure strontium salicylate. It would be a sufficient answer to this contention to say that the jury were fully warranted, under all the evidence in this case, in finding that a competent and careful pharmacist would have understood what was meant by the word Wyatt. The statute provides that the druggist shall not "sell, furnish or compound any drug, medicine, chemical or *pharmaceutical preparation*, substitute or cause to be substituted therefor, without notification to the purchaser, any other drug, medicine, chemical *or pharmaceutical preparation*." *It is undisputed that Parke-Davis & Company was the only pharmaceutical manufacturer that compounded pure strontium salicylate*

and that Zaritsky used this compound in filling the prescription. It is further undisputed in the evidence that the only compound manufactured by Wyeth which contains strontium salicylate is effervescent strontium salicylate. Zaritsky admitted that he was familiar with the two compounds and that the word Wyeth on the prescription indicated to him that "the doctor had in mind a brand of strontium salicylate." It is clear that the prescription did not call for the Parke-Davis compound, and yet Zaritsky used this dangerous drug in filling the prescription. He admitted that physicians sometimes use the word Wyeth for John Wyeth & Brother in the prescriptions and that Wyatt sounds like Wyeth "if you slur it." It is significant, in this connection, that the record shows that the court reporter was not always able to tell whether the name used in a question and answer was Wyatt or Wyeth. Zaritsky's excuse for disregarding the word Wyatt is that he looked in the red book and found no manufacturer by the name of Wyatt. The name Wyeth, however, would put any careful pharmacist upon his guard, and under such a situation his duty was plain. If a prescription is doubtful as to what drug is really intended it is the duty of the pharmacist to be alert to avoid a mistake, and if there is any reasonable doubt as to the identical thing ordered, it is his duty to take all reasonable precaution to be certain that he does not sell one thing when another is called for. (See *Tombari v. Connors, supra,* p. 236.) A contrary rule would tend to make a pharmacy a menace, instead of an aid, to suffering humanity. The plaintiff's evidence shows that it required three calls at the defendant's place of business before the prescription was furnished, and therefore Zaritsky had ample time to make proper inquiry. Zaritsky had graduated in pharmacy only a few weeks before the time in question. He was not then registered or licensed as a regular pharmacist.

He had not yet passed the examination required by the statute to entitle him to be registered as a registered pharmacist, and it is difficult to understand why he did not call up Dr. Markiewicz in reference to the prescription. He did not even consult one of the other pharmacists in defendant's place of business. Even the dangerous character of the drug used by him in filling the prescription did not cause him to make inquiry. The jury were fully warranted, from the evidence, in finding that if the plaintiff used the prescription as filled it might prove fatal and in any event would cause very serious consequences. We entirely approve of the action of the jury in refusing to believe the evidence of the defendant to the contrary. The jury were fully warranted in finding that Zaritsky was not a competent pharmacist. But even if it be assumed that he was competent, he was grossly negligent in filling the prescription as he did. He admits, in effect, that he filled the prescription with a compound not indicated by the prescription.

The defendant next contends that the court erred in giving plaintiff's instruction number two to the jury. This instruction reads as follows:

"The court instructs the jury that under the law of Illinois, no druggist or other person being requested by means of prescription, or in any manner, to sell, furnish or compound any drug, medicine, chemical or pharmaceutical preparation, shall substitute or cause to be substituted therefor, without notification to the purchaser, any other drug, medicine, chemical or pharmaceutical preparation."

This instruction is in the language of the statute and it does not purport to direct a verdict. The contention of the defendant is that "the prescription was filled exactly as called for and that there was no substitution and no drug or chemical preparation dispensed to the purchaser other than the one called for in the prescrip-

tion." There is no merit in this contention. The defendant admits, as it must, that instruction number eight, given at its request, covers the specific charge of substitution and places the burden upon the plaintiff of proving it.

The defendant next contends that "the verdict and judgment are against the manifest weight of the evidence." The contention is that "the record in this case clearly indicates beyond doubt that there was no substitution but that the plaintiff received the drug from the dispensing defendant druggist exactly as called for." There is no merit in this contention. In our judgment the jury would not have been justified in finding a verdict for the defendant.

The defendant next contends that "the court erred in admitting evidence by the attending physician which invaded the province of the jury." In the direct examination of Dr. Markiewicz, the attending physician, the following occurred: "Q. Are you able to form an opinion, Doctor, based on reasonable certainty as to whether or not the conditions that you have described as existing in the plaintiff may or could have arisen and be caused by the administering of the strontium salicylate? A. I do. Mr. Crowe (attorney for defendant): That calls for an answer yes or no. A. I do, yes. Mr. Irwin (attorney for plaintiff): What is your opinion? Mr. Crowe: Objected to; it invades the province of the jury. It has been held by the Supreme Court in this state to be absolutely bad. . . . The Court: I am going to let him answer. Mr. Crowe: All right. Mr. Irwin: Q. What is your opinion, Doctor? A. As to what? Q. Whether or not the conditions that you have described as existing in the plaintiff, whether you have an opinion based on reasonable certainty whether or not the conditions that you have described as existing in the plaintiff may or could have been caused or produced by the strontium salicylate administered to

the plaintiff. A. I do. Mr. Crowe: That I object to. The Court: Objection overruled. . . . A. In my opinion this woman has a chronic nephritis. Mr. Crowe: I move to strike the answer. (The answer was stricken.) . . . Q. Whether or not the condition may or could have been caused or produced by the administering of the strontium salicylate. Mr. Crowe: The same objection. A. I do. Mr. Irwin: You mean you think it was? A. Yes, sir. Mr. Crowe: I move to strike the answer. The Court: Overruled." In support of its contention the defendant relies upon the case of *Kimbrough v. Chicago City Ry. Co.*, 272 Ill. 71. In that case the court was passing upon the competency of certain questions put to an expert who was testifying in reference to a hypothetical person. The court held that "a physician may be asked whether the facts stated in a hypothetical question are sufficient, from a medical or surgical point of view, to cause and bring about a certain condition or malady, or he may be asked whether or not a given condition or malady of a person may or could result from and be caused by the facts stated in the hypothetical question, but he should not be asked whether or not such facts did cause and bring about such condition or malady." Even if Dr. Markiewicz had been placed upon the stand as an expert witness to testify as to a hypothetical person, the question complained of would have been in accord with the ruling in the *Kimbrough* case. Moreover, Dr. Markiewicz was the attending physician and was called upon to give his opinion in reference to the conditions he found. We may state that the defendant, in making the instant contention, has not accurately followed the record.

The defendant next contends that "the verdict of the jury is so excessive in amount as to indicate the jury were actuated by passion and prejudice." We find no merit in the contention that the amount of the verdict indicates passion and prejudice. After a very

careful consideration of the evidence bearing upon the question of damages, we have reached the conclusion that the amount awarded is excessive. It is undisputed that pure salicylate is used as a corn cure and that when it is directly applied to a corn it cures it by softening and eating away the tissues of it, and it is clear that the drug taken into the stomach in certain quantities produces very serious injuries to the system of the patient. That she might have died but for the elimination process followed by Dr. Markiewicz seems a reasonable conclusion. That the plaintiff was still suffering from the effects of the drug at the time of the trial is evident. However, the full extent and character of the permanent injury is not clearly shown by the proof. After a very careful consideration of the question we have reached the conclusion that $10,000 would be a reasonable compensation for the damages sustained by the plaintiff. Accordingly, if within 10 days plaintiff files in this court a remittitur of $10,000, the judgment against the defendant will be affirmed for $10,000, otherwise it will be reversed and the cause remanded to the superior court of Cook county for another trial.

*Affirmed for $10,000 upon remittitur; otherwise reversed and cause remanded for another trial.*

GRIDLEY, P. J., and KERNER, J., concur.