JOSEPH C. TREMBLAY *vs.* OTIS W. KIMBALL.

Androscoggin.    Opinion September 1, 1910.

*Druggists.   Degree of Skill Required.   Care.   Ordinary Care.   Duties.   Prescriptions.
Negligence.   Burden of Proof.   Evidence.*

A registered apothecary or any one who undertakes to act as a qualified druggist in preparing medicines and filling prescriptions must possess a reasonable and ordinary degree of knowledge and skill respecting the duties he professes to be able to perform, but he need not possess the highest degree of knowledge and skill known in his profession; it being sufficient that he have that reasonable degree of learning and skill ordinarily possessed by other druggists in good standing as to qualifications in similar communities.

A druggist must use reasonable and ordinary care in applying his knowledge and skill in compounding medicines, filling prescriptions, and performing other duties of an apothecary, but he need not use extraordinary care of a higher degree than is ordinarily used by other qualified druggists.

A druggist must give his patrons the benefit of his best judgment in compounding medicines, filling prescriptions, etc., but is not necessarily responsible for an error of judgment consistent with ordinary skill and care.

The ordinary care required of a druggist in compounding medicines and filling prescriptions requires a degree of vigilance and prudence commensurate with the dangers involved, and the highest practicable degree of prudence, thoughtfulness, vigilance, and the most exact and reliable safeguards consistent with reasonable conduct of the business that human life may not be exposed to the danger resulting from substitution of deadly poisons for harmless medicine.

In an action against an apothecary for negligence in filling a prescription, the burden was on the plaintiff to prove that in delivering corrosive sublimate tablets, instead of chlorodine tablets called for in the prescription, the apothecary failed to use the degree of care required by law.

Evidence *held* to sustain a finding that an apothecary sued for negligently substituting corrosive sublimate tablets for chlorodine tablets as called for by a prescription failed to use ordinary care.

On motion by defendant.    Overruled.

Action on the case to recover damages for the alleged failure of duty on the part of the defendant, a registered apothecary, in filling a physician's prescription by substituting corrosive sublimate tablets for chlorodyne tablets.

The declaration in the plaintiff's writ states the case as follows:

"For that the said defendant on the eighth day of May A. D., 1909, at East Livermore in the County of Androscoggin in the State of Maine, was employed as a duly registered apothecary in a drug-store, and had sole charge of compounding, putting up and dispensing drugs and medicines under the provisions of chapter 30 of the Revised Statutes of the State of Maine, for a consideration to said defendant from the plaintiff was using medicines and drugs in preparing, compounding and putting up or filling written prescriptions of physicians. And the plaintiff avers that said defendant was then and there bound to use such due care, judgment and skill in preparing, compounding and putting up prescriptions and dispensing medicines and drugs to customers or patients having prescriptions from physicians as is required to prevent the misuse and misapplication of all medicines, and drugs, and especially of all deleterious or poisonous substances, so as to avert all possible danger to patients and customers. But that on said 8th day of May at said drug-store in said East Livermore, said defendant did so carelessly, unskillfully, and negligently perform his said duty as a registered apothecary aforesaid, that in putting up or filling for the plaintiff a physician's prescription of the following tenor to wit:

'L. Geo. Belisle, M. D. Chisholm, Maine.

R 5521—5-8-09   Chlorodyne Tablets No. XXV

Sig.   Une pilule a Toutes les 4 heures

L. Geo. Belisle, M. D.'

Which he then and there received, took, and undertook to put up or fill. That he substituted for and instead of chlorodyne tablets, antiseptic tablets each containing a fatally poisonous dose of corrosive sublimate to wit:   7 grains of corrosive sublimate in each tablet with directions in writing upon the box containing said tablets to take one tablet every four hours, and delivered said box containing said tablets with said directions to the plaintiff and received from the plaintiff the sum of twenty-five cents in payment therefor, and the plaintiff avers that he then and there confiding in the skill,

judgment and care of said defendant in his business and duty did take into his mouth and swallow into his stomach one of said corrosive sublimate tablets aforesaid, which said tablet then and there immediately caused and produced burning heat in his throat : Severe pains in his stomach and intestines, great thirst, nausea, and retching, feeble pulse, cold sweating, cramps and inability to talk, a boiling sensation in his stomach and froth foamed from his mouth, and his stomach and intestines were burned, poisoned and corroded and have remained so hitherto, and have become and are now strictured, whereby and by reason whereof he has suffered great pain and anguish, and become sick and unable to perform any labor then or since, and was put to great expense for medical attendance and nursing to wit : the sum of two hundred dollars and lost a large sum of money which he would otherwise have received for his labor to wit : the sum of two hundred dollars, and other wrongs and injuries sustained all to his damage in the sum of five thousand dollars. And the plaintiff further avers that L. Geo. Belisle, M. D., from whom he procured the aforesaid prescription is a physician and surgeon practicing his said profession in the village of Chisholm in the State of Maine. And that he acted in good faith and in the exercise of due care, and free from negligence or contributory negligence in the purchase and use of said tablets, but through the negligence and carelessness of said defendant, his health and prospects have been ruined."

Plea, the general issue. Verdict for plaintiff for $1400. The defendant then filed a general motion for a new trial.

The material facts are stated in the opinion.

*B. Emery Pratt*, for plaintiff.

*Newell & Skelton*, for defendant.

Sitting : Whitehouse, Peabody, Spear, Cornish, King, JJ.

Whitehouse, J. The plaintiff recovered a verdict of $1400 for an alleged failure of duty on the part of the defendant, who was a registered apothecary employed by the Hamel Brothers in their drug store at Livermore Falls, and in that capacity filled a physician's

prescription for the plaintiff calling for chlorodine tablets by substituting corrosive sublimate tablets containing about 7.3 grains of bichloride of mercury and 7.3 of muriate of ammonia. One grain of this mixture was sufficient to cause death. Neither of the Hamel Brothers was a registered apothecary or pharmacist, and the sole responsibility of compounding medicines and filling prescriptions was imposed upon the defendant. It is not in controversy that the plaintiff presented to the defendant a prescription from a regular physician calling for chlorodine tablets and that instead of this harmless medicine the defendant delivered to the plaintiff the corrosive sublimate tablets, the deadly poison above described. According to the directions accompanying the prescription, the plaintiff immediately took one tablet and thereby suffered the injuries of which he complains, his life being saved only by the prompt administration of appropriate remedies. The physician states that the plaintiff is now suffering from a stricture of the pylorus or lower part of the stomach and that in his opinion he will never be able to perform any hard work in the future. It is alleged in the plaintiff's declaration that in filling this prescription, the defendant performed his duty as an apothecary, carelessly, unskillfully and negligently. On the other hand, it is contended by the defendant that the mistake was made by one of the Hamel Brothers in having two bottles side by side marked chlorodine tablets, one of which, however, contained the poisonous tablets in question, and that these tablets so closely resembled each other that it was not negligence on the part of the defendant to fill the prescription as he did. The jury returned a verdict for the plaintiff as above stated and the case comes to the Law Court on a motion to set aside this verdict as against the evidence.

The rules of law governing this class of cases are closely analogous to those applicable to physicians and surgeons. A registered apothecary, or any person who undertakes to act in the capacity of a qualified druggist in preparing medicines and filling physicians' prescriptions, is required by law in the first place, to possess a reasonable and ordinary degree of knowledge and skill with respect to the pharmaceutical duties which he professes to be competent to perform.

He is not required to possess the highest degree of knowledge and skill to which the art and science may have attained. He is not required to have skill and experience equal to the most eminent in his profession. He is only required to have that reasonable degree of learning and skill which is ordinarily possessed by other druggists in good standing as to qualifications in similar communities.

In the second place the law imposes upon the druggist the obligation to exercise all reasonable and ordinary care and prudence in applying his knowledge and skill in compounding medicines, filling prescriptions and performing all of the other duties of an apothecary. He is not bound to use extraordinary care and prudence, or a greater degree of care than is ordinarily exercised by other qualified druggists. Ordinary skill is the test of qualification and ordinary care is the test of the application of it.

Finally, in applying his knowledge and exercising care and diligence, the druggist is bound to give his patrons the benefit of his best judgment. For even in pharmacy there is a class of cases· in which judgment and discretion must or may be exercised. The druggist is not necessarily responsible for the results of an error of judgment which is reconcilable and consistent with the exercise of ordinary skill and care. He does not absolutely guarantee that no error shall ever be committed in the discharge of his duties. It is conceivable that there might be an error or mistake on the part of a qualified druggist which would not be held actionable negligence. *Pullen* v. *Wiggin*, 51 Maine, 596 ; *Leighton* v. *Sargent*, 7 Foster (N. H.) 460 ; *Small* v. *Howard*, 128 Mass. 131. As to druggists see *Thomas* v. *Winchester*, 6 N. Y. 397 ; *Norton* v. *Sewall*, 106 Mass. 143 ; *McDonald* v. *Snelling*, 14 Allen 290 ; *Brown* v. *Marshall*, 47 Mich. 576.

But while as has been seen, the legal measure of the duty of druggists towards their patrons, as in all other relations of life, is properly expressed by the phrase ''ordinary care," yet it must not be forgotten that it is ''ordinary care" with reference to that special and peculiar business. In determining what degree of prudence, vigilance and thoughtfulness will fill the requirements of ''ordinary care" in compounding medicines and filling prescriptions, it is

necessary to consider the poisonous character of so many of the drugs with which the apothecary deals and the grave and fatal consequence which may follow the want of due care. In such a case "ordinary care" calls for a degree of vigilance and prudence commensurate with the dangers involved. The general customer ordinarily has no definite knowledge concerning the numerous medicines and poisons specified in the "U. S. Dispensatory and Pharmacopoeia," which registered apothecaries are by our statutes expressly allowed to keep, but must rely implicitly upon the druggist who holds himself out as one having the peculiar learning and skill and conceptions of legal duty necessary to a safe and proper discharge of that duty. "Ordinary care" with reference to the business of a druggist must therefore be held to signify the highest practicable degree of prudence, thoughtfulness and vigilance and the most exact and reliable safeguards consistent with the reasonable conduct of the business in order that human life may not constantly be exposed to the danger flowing from the substitution of deadly poisons for harmless medicine. As observed by Judge Cooley in *Brown* v. *Marshall*, 47 Mich. 576, "The case it must be conceded is one in which a very high degree of care may justly be required. People trust not merely their health but their lives to the knowledge, care and prudence of druggists, and in many cases a slight want of care is liable to prove fatal to some one. It is therefore proper and reasonable that the care required shall be proportioned to the danger involved. *Maxfield* v. *R. R. Co.*, 100 Maine, 80 and cases cited. *Raymond* v. *Railroad Co.*, 100 Maine, 531.

In the case at bar no question appears to have been raised in regard to the skill and experience of the defendant as a registered apothecary, and it was incumbent upon the plaintiff to prove that in delivering to him corrosive sublimate instead of the chlorodine tablets called for in the prescription, the defendant failed to exercise the high degree of care and prudence required of him under the rules above stated.

When the physician who prescribed the chlorodine tablets for the plaintiff, returned to the defendant the poisonous tablets of corrosive sublimate and informed him that "there must be a mistake," the

defendant freely admitted that there had been a mistake but claimed that at the time of the removal of Hamel Brothers from Chisholm to Livermore Falls, one of the firm had by mistake put these large white tablets into a bottle having upon it the manufacturer's label "chlorodine tablets." The defendant testifies that Hamel stated to him that he "put those tablets in there" and when the stock was removed from the other store 'the tablets got mixed or that bottle was mixed in with the others' and that was the explanation." It is also contended in the argument for the defendant that not only were those two bottles alike that were labeled "chlorodine tablets" but that the tablets in the two bottles were alike in color, size and shape.

But the evidence fails to support the contention that the tablets in both bottles had the same appearance. On the contrary, the physician distinctly states in his testimony that the tablets in the two bottles shown him by the defendant were wholly and strikingly different in both color and size, that in one were large white tablets "marked 'poison' in big letters on the tablets," and in the other were the "real chlorodine tablets" small and very dark green in color, and having the same appearance as the small dark tablets exhibited in evidence to the court. The defendant denies that the word "poison" was stamped on the white tablets, but admits that the genuine chlorodine tablets with which he filled the plaintiff's prescription, after the discovery of the mistake, were taken from the other one of the two bottles on the shelf labeled "chlorodine tablets," and that those tablets "looked like" the two small dark green ones in evidence. He further states that the bottle from which the white poisonous tablets were taken disappeared without his knowledge." There is evidence that chlorodine tablets are of different colors, but no evidence of white ones. The physician states that he never saw any white ones. There is a conflict of testimony, as already stated, upon the question whether the word "poison" was stamped on the white tablets delivered to the plaintiff by the defendant. One of these tablets exhibited in court has been so discolored and worn by handling that no letters can now be distinguished even with the aid of a magnifying glass.

Although the two bottles of tablets in question both had the manufacturer's labels upon them, it must be remembered that the tablets were not sold in unopened bottles as original packages, but were taken out of a large quantity in a bottle that had been opened, and thus the defendant had full opportunity to inspect and examine the tablets. It is inconceivable that if he had given thoughtful attention to the matter he could have failed to note the striking difference in the appearance of the tablets in the two bottles bearing the same label, and the extraordinary if not unprecedented fact that in one of them the supposed chlorodine tablets were white. Yet, so far as appears, no special examination or effort was made to determine the real character of the white tablets but apparently without question or hesitation they were delivered to the plaintiff as harmless medicine. The explanation of the mistake was evidently unsatisfactory to the jury.

It is the opinion of the court that there was sufficient evidence to support the conclusion manifestly reached by the jury that although the defendant may have been a skillful and competent druggist, he unfortunately omitted on the occasion in question to exercise such care and prudence and to take such reasonable precautions as the safety of his customer and the measure of his own legal duty required.

*Motion for new trial overruled.*