2000 ME 63

**Antoinette WALTER**

v.

**WAL–MART STORES, INC.**

Supreme Judicial Court of Maine.

Argued Jan. 5, 2000.
Decided April 12, 2000.

Steven D. Silin (orally), Paul F. Macri, Berman & Simmons, P.A., Lewiston, for plaintiff.

James M. Bowie (orally), Elizabeth K. Peck, Mark V. Franco, Thompson & Bowie, Portland, for appellant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER and CALKINS, JJ.

CALKINS, J.

[¶ 1] Wal–Mart Stores, Inc. appeals from a judgment entered in the Superior Court (Knox County, *Marsano, J.*) following a jury trial awarding damages to Antoinette Walter in the amount of $550,000 for her claim of pharmacist malpractice. Wal–Mart contends that the Superior Court erred in (1) granting Walter's motion for judgment as a matter of law on liability; (2) denying Wal–Mart's motion for judgment as a matter of law; and (3) denying Wal–Mart's motion for mistrial following comments by Walter's attorney during closing argument. Wal–Mart also appeals on the ground that the jury verdict was excessive and the result of bias and prejudice. We affirm the judgment.

## I. FACTS

[¶ 2] Walter, an eighty-year-old resident of Rockland, was diagnosed with a type of cancer which attacks the lymphatic system. Dr. Stephen Ross, Walter's treating physician and a board-certified oncologist, termed her condition treatable with the proper medication. Dr. Ross prescribed Chlorambucil, a chemotherapy drug, for Walter. On the prescription slip, he explicitly called for Chlorambucil, the generic name, because he feared that the drug's brand name, Leukeran, could be confused with other drugs with similar trade names.

[¶ 3] Walter took the prescription for Chlorambucil to the pharmacy in the Wal–Mart store in Rockland on May 7, 1997. Henry Lovin, a Maine licensed pharmacist and an employee of Wal–Mart, was on duty at the pharmacy. Instead of giving Walter Chlorambucil, as called for in the prescription, Lovin gave her a different

drug with the brand name of Melphalen. The generic name for Melphalen is Alkeran. Lovin did not speak with Walter at the time he filled the prescription, but he provided her with an information sheet which described the effects of Melphalen. Melphalen is also a chemotherapy drug, but it is a substantially more powerful medication than Chlorambucil. Melphalen is typically given in smaller doses over shorter periods of time than is Chlorambucil, and doctors monitor it more closely. Melphalen has a very toxic effect on the body, and it substantially suppresses bone marrow. It has a longer life in the body than Chlorambucil, which means that any side effects from it last longer.

[¶ 4] To the extent that Walter noticed that the information sheet and bottle label read Melphalen, it did not make an impression on her. She assumed that the drug she had been given was the same as Dr. Ross had prescribed, and she began taking the prescribed dosage. Within seven to ten days of starting the drug treatment, Walter began to suffer from nausea and lack of appetite. When she referred to the information sheet, Walter saw that such side effects are common for chemotherapy drugs. She continued to take the Melphalen. During the third week after starting the medication Walter noticed bruises on her arms and legs, and during the fourth week she developed a skin rash on her arms and legs. Although the information sheet warned that bruises and rashes should prompt a call to the doctor, Walter waited a few days before attempting to contact Dr. Ross.

[¶ 5] Dr. Ross testified at trial that his notes indicated that Walter should have had blood tests two weeks after starting medication and that she was to have scheduled an appointment with him within four weeks of beginning the medication. He also testified that because Chlorambucil is slow-acting, he does not insist that his patients have blood tests done in fourteen days but only that they have blood work periodically. Walter testified that she understood she was to have a follow-up appointment with Dr. Ross in four weeks and blood tests sometime before that appointment.

[¶ 6] On the twenty-third day after starting the medication, Walter had blood tests done. She attempted to reach Dr. Ross by phone to tell him about the side effects, but she was unsuccessful until June 3, 1997. On that day Dr. Ross told her that her blood levels were low and to stop taking the medication immediately. He scheduled an appointment for June 5. Walter, however, was rushed to the hospital later in the day on June 3 when she suffered gastrointestinal bleeding. Following her emergency admission, Walter remained in the hospital five weeks and received numerous blood transfusions. She suffered several infections, and a catheter was placed in her chest. The bruising and skin rash continued. For a period of time she was unable to eat because of bleeding gums and an infection in her mouth. Because of her weakened immune system, Walter's visitors could not come within ten feet of her.

[¶ 7] Prior to receiving the Melphalen, Walter lived independently and was active. Following her hospital discharge on July 7, 1997, she was physically weak. She initially had to make daily trips to the hospital and later went less frequently. She had to have additional transfusions after she left the hospital. Melphalen did have the effect of causing her cancer to go into remission. Walter's total medical bills for her treatment came to $71,042.63.

[¶ 8] The two-day jury trial was held in February 1999. Wal–Mart moved for judgment as a matter of law at the close of Walter's case on the grounds that she had failed to present expert testimony on the standard of care by pharmacists, and the motion was denied. At the close of the evidence Walter moved for a judgment as a matter of law, and the court granted Walter's motion concluding that she was entitled to judgment on liability. During Walter's closing argument, Wal–Mart

moved for a mistrial arguing that certain comments by Walter's counsel were improper, and the motion was denied. The jury awarded Walter $550,000 in damages. Wal–Mart's post-trial motion for judgment as a matter of law or a new trial was denied.

## II. WALTER'S MOTION FOR JUDGMENT ON LIABILITY

■■■ [¶ 9] The court granted Walter's motion for judgment on the issue of liability. "In reviewing a trial court's disposition of a motion for judgment as a matter of law, we view the evidence together with all justifiable inferences in the light most favorable to the party opposing the motion." *Lewis v. Knowlton*, 1997 ME 12, ¶ 6, 688 A.2d 912, 913. If a reasonable view of the evidence would sustain a verdict for the nonmoving party, the motion must be denied. *See id.*

[¶ 10] The effect of the court's grant of Walter's motion was a determination, as a matter of law, that Wal–Mart had a duty

to Walter which it breached; that breach caused Walter harm; and Walter was not negligent—or if she was negligent, her negligence did not proximately cause her harm. The only issue left for the jury was the amount of damages caused by Wal–Mart's negligence and whether those damages should be reduced because of any action or inaction by Walter to take reasonable steps to reduce the extent of her injuries.

### A. Wal–Mart's Representations to the Jury

[¶ 11] Wal–Mart argues that the court erred in granting Walter's motion for judgment as a matter of law because it should have submitted the issues of negligence, proximate cause, and comparative negligence to the jury. Walter contends that Wal–Mart judicially admitted liability in its opening statement to the jury. The clear import of Wal–Mart's opening statement was that liability was not an issue, and the only question that the jury would have to decide was the amount of damages.[1]

1. Wal–Mart's counsel began his opening statement by explaining the process of a lawsuit and why Wal–Mart denied liability in its answer. He then stated:

What I'm here to tell you right now is since the filing of the complaint and filing of the answer, Wal–Mart has never denied responsibility for this incident. Never.

Going back to what happened. [Walter's attorney] and I are in substantial agreement in terms of what happened on May 7, 1997, and what has to [sic] occurred since. He asked you why we are here. I'll tell you why we are here. The reason is that the parties have a dispute. They have a difference of opinion as to what constitutes fair, reasonable and just compensation for Mrs. Walter. That's why we are here. We can't agree. It's as simple as that. We just can't agree on that issue. We need your help.
. . . .
It's not because we are blaming Mrs. Walter. It's not because we are trying to deflect blame. And it's not because we are trying to sort of make the issues obscure or distracting. We are going to put all the cards on the table. There are no secrets. There are no major disputes as to what occurred. There are no major disputes as to the facts.

The hardest issue and the one that is going to be in your laps at the end of tomorrow is what monetary amount represents fair and just compensation for Mrs. Walter? You will be asked to consider medical bills and what she went through during the hospitalization and what she has done [sic] through since then. Wal–Mart is here, and I'm here to ask you as the conscience of the community what that figure is. That's really why we are here.

Wal–Mart's counsel then described the pharmacist, where he came from, his family and other information about him,

Mr. Lovin, Henry, was familiar with Dr. Ross and Dr. Ross's prescriptions. He filled many prescription [sic] from Dr. Ross in the past, including for Chlorambucil, so he knew what he wanted when he used that word.

The evidence in this case will show that on—the statement was made on May 7, 1997—Mr. Lovin was given a prescription for Chlorambucil. What came to his mind was Alkeran. And from there the mistake was made. And it was sort of on a path of not being able being [sic] corrected in his mind. He was confident that Chlorambucil was Alkeran. It was a mistake. And it's a

[¶ 12] Statements made by counsel during an opening statement or closing argument can result in a judicial admission. *See Kohne v. Yost*, 250 Mont. 109, 818 P.2d 360, 362 (1991). In order to be considered a judicial admission the statements must be deliberate, clear, and unambiguous. *See MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997). When made in an opening statement, the alleged judicial admission must be considered in the context of the entire statement. *See Lowe v. Kang*, 167 Ill. App.3d 772, 118 Ill.Dec. 552, 521 N.E.2d 1245, 1247 (1988). The statement must be unequivocal and pertain to a factual matter. *See Larson v. A.T.S.I.*, 859 P.2d 273, 276 (Colo.App.1993).

[¶ 13] Wal–Mart's opening statement admitted the error made by its pharmacist in filling the prescription but because negligence consists of both law (whether a duty exists and what that duty is) and facts (whether the duty was breached), there was no judicial admission of negligence. Furthermore, the statement taken in its entire context, does not contain an unequivocal admission that the mistake in filling the prescription caused Walter's harm. While Wal–Mart appears to concede that there was no fault on the part of Walter, the mention of the delay in obtaining the blood test renders the concession ambiguous. For these reasons, we cannot conclude that there was a judicial admission that Wal–Mart was liable for Walter's damages.

## B.   Wal–Mart's Negligence

[¶ 14] Walter had the burden to prove that Wal–Mart, through its pharma-

cist employee, owed a duty to Walter that it breached, thereby causing her harm. In *Tremblay v. Kimball*, 107 Me. 53, 77 A. 405 (1910), we held that pharmacists owe their customers a duty of ordinary care, but that "ordinary care" for a pharmacist means that "the highest practicable degree of prudence, thoughtfulness, and vigilance and the most exact and reliable safeguards" must be taken. *Id.* at 58, 77 A. at 408.

[¶ 15] Lovin, the Wal–Mart pharmacist, readily admitted that he made an error in filling Walter's prescription. He testified that he thought that the brand name for Chlorambucil was Alkeran, and he filled the prescription with Alkeran, which is Melphalen. Lovin said that he made a "serious error" that did not "satisfy the proper standard of care for a pharmacist." He admitted that he would have discovered the error if he had followed the standard four-step process utilized to check for errors. He acknowledged that to comply with the standard of pharmacy care he should have checked the stock bottle against the prescription. He further admitted that the standard of practice required that he counsel Walter when she picked up the prescription, at which time he would have showed her the drug and discussed it with her. He testified that he did not counsel her, but if he had done so, he would have discovered the error. He also said that Walter would have no reason to suspect that she was given the wrong drug.

[¶ 16] Pursuant to the standard of "the highest practicable degree of prudence,

mistake for which he's deeply sorry. But that's irrelevant.
The fact is that a mistake was made. That he didn't realize it at the time and wasn't told of the mistake until June 3rd when he received a call from Dr. Ross.
Counsel went on to describe the difference in the medications. He mentioned that Dr. Ross's notes stated that Walter was to have her blood checked in two weeks and that Walter did not have her blood taken until later. He briefly mentioned her hospitaliza-

tion and the fact that her cancer was in remission. He told the jury it didn't matter that the defendant was Wal-Mart, that it could have been the drug store down the street. Counsel concluded by thanking the jurors and stating:
I would ask you to keep your eye on the target: fair and just and reasonable compensation. That's going to be the issue that you will have to decide when you go into the jury room at the end of the evidence.

thoughtfulness, and vigilance and the most exact and reliable safeguards" as set forth in *Tremblay v. Kimball,* Lovin's testimony established that the standard was breached. Even if we were to determine that the standard of practice for pharmacists is the skill and diligence exercised by similar professionals,[2] Lovin's testimony established that standard and the breach of it. None of this evidence was disputed. A jury, acting reasonably, could not have found that Wal–Mart was not negligent.

## C. Causation

[¶ 17] In order to establish liability a plaintiff in any negligence action must show that the defendant's negligence was the proximate cause of the plaintiff's harm. Wal–Mart argues that Walter's motion should have been denied because she failed to prove that Wal–Mart's negligence in filling the prescription was the cause of her injury. Causation means "that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Wheeler v. White,* 1998 ME 137, ¶ 7, 714 A.2d 125. The defendant's conduct must be a "substantial factor" in bringing about the plaintiff's harm in order for there to be proximate cause. *Id.* Wal–Mart specifically requested a jury instruction on proximate cause.

[¶ 18] There was uncontroverted medical evidence that Melphalen, which Wal–Mart provided Walter erroneously, caused damage to her body. Although she had lymphoma, the disease did not limit her functioning. Witnesses described her as a very active person until her hospitalization occurred. Dr. Ross testified that the Melphalen made Walter seriously ill, to the point that he was not sure she would survive, and that her lack of energy after her release from the hospital was the result of the illness caused by the wrong medication. Wal–Mart's expert oncologist also testified that the side effects of Melphalen caused the lengthy hospitalization, and the hospitalization itself likely caused Walter's malaise and depression after her discharge.

[¶ 19] Wal–Mart argues that the jury should have been instructed on proximate cause because its expert speculated that if a blood test had been done fourteen days after starting the medication it might have shown lowered blood levels and, depending on how low those levels were, Walter's physician might have stopped the medication, and if the medication had been stopped sooner, the harmful effect may have been less. Wal–Mart's expert did not testify that there would have been no damage if a blood test had been done on the fourteenth day. In fact, in his description of Melphalen, he noted it has a long life in the body and that its side effects last longer.[3] No jury acting rationally could determine that Walter's failure to have a blood test in fourteen days broke the chain of causation between the pharmacist's negligence and Walter's injuries. No reasonable factfinder could have found that Wal–Mart's negligent act in misfilling the prescription was not a substantial cause in bringing about Walter's suffering. "[W]hen the totality of the evidence adduced in *any particular case* is so overwhelming that it leaves open to a factfinder, acting rationally, only one conclusion on the issue, the issue is then determined as a matter of law." *Laferriere v. Paradis,* 293 A.2d 526, 528 (Me.1972). The trial court did not err in granting

---

2. For a discussion of pharmacists' traditional or ordinary standard of care and the professional standard of care, *see* Lauren Fleischer, Note, *From Pill–Counting to Patient Care: Pharmacists' Standard of Care in Negligence Law,* 68 FORDHAM L.REV. 165, 174–75 (1999).

3. The blood tests alone did not reveal that the wrong medication had been given. Dr. Ross did not discover that she was taking the wrong medication until after she was admitted to the hospital.

judgment as a matter of law to Walter on the issue of causation.[4]

## D. Comparative Negligence and Mitigation of Damages

[¶ 20] Wal–Mart argues that Walter's motion for judgment on liability should have been denied because Wal–Mart raised the defense of comparative negligence and it was entitled to have the jury decide whether Walter was negligent. Wal–Mart claims that Walter should have realized that the drug name on the medicine container did not match the medication that she had discussed with Dr. Ross. Wal–Mart also argues that Walter was negligent when she did not contact Dr. Ross immediately upon noticing the rash and bruising.

[¶ 21] Under Maine's comparative negligence statute, the damages owing to a plaintiff may be reduced when the plaintiff's harm is partly the result of the plaintiff's own fault, and fault is defined as the negligence that would give rise to the defense of contributory negligence. *See* 14 M.R.S.A. § 156 (1980). If the plaintiff's fault is equal to or greater than that of the defendant, the plaintiff cannot recover damages. *See id.*

### 1. Walter's Failure to Discover Wal–Mart's Error

[¶ 22] Turning first to Wal–Mart's contention that Walter was contributorily negligent in failing to discover that she had been given the wrong medication, we conclude that a jury, acting rationally, on this evidence could not find that she was negligent. Lovin testified that Walter "would have no way of knowing" that she had been given the wrong medication, and there was no evidence that Walter should have been expected to discover Wal–Mart's negligence.[5] Thus, it was not error to refuse to instruct the jury on comparative negligence concerning Walter's failure to discover Wal–Mart's error.

### 2. Walter's Failure to Notify her Doctor Immediately of Side Effects

[¶ 23] Wal–Mart claims that Walter's delay in calling her doctor to report the skin rash and bruising was negligence on her part that contributed to her suffering. Walter contends that any inaction on her part goes to mitigation of damages and not comparative negligence.

[¶ 24] Traditionally, one of the distinctions between contributory negligence and the doctrine of mitigation of damages, or avoidable consequences, has been a temporal one. Contributory negli-

---

4. The court twice, in its instructions to the jury, stated that it was Walter's burden to prove to them by a preponderance of the evidence that Wal–Mart's negligence caused Walter's damages: (1) "[A]ny damages that you award in this case must be based upon a finding by you that the plaintiff, who is the one seeking damages, has convinced you by a preponderance of the evidence that the particular injury and pain and suffering for which she seeks compensation was caused by the defendant's negligence."; and (2) "You must determine the damages to which the plaintiff is entitled as a result of the injury proximately caused by the defendant."

5. We are aware of two cases from other jurisdictions in which a comparative negligence instruction was given when a pharmacist gave the plaintiff the wrong medication. The facts in one case, however, make it distinguishable from Walter's situation. In *Forbes v. Wal-*

*green Co.,* 566 N.E.2d 90, 91 (Ind.App.1991), the plaintiff had been taking medication for headaches. When she had the prescription refilled, she noticed that the medication she was given was different in size, shape, and color from what she had been taking, but she took it anyway for several months. The wrong medication did not cause her to be sick, but it was ineffective on her headaches. *See id.* Walter had never taken her medication previously and had no reason to be suspicious of its size, shape, or color. In the other case, the ten percent reduction of plaintiff's damages for comparative negligence was not appealed or discussed. *See Van Hattem v. Kmart Corp.,* 719 N.E.2d 212, 222 (Ill.App. 1999) (reversing the jury verdict for plaintiff because the trial court refused a special interrogatory to the jury under the Illinois wrongful death statute concerning the contributory negligence of a beneficiary of a decedent).

gence is generally unreasonable behavior by a plaintiff before or concurrent with the injury imposed by the defendant, whereas the avoidable consequences doctrine is applied to plaintiff's action or inaction after the defendant's negligent act. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 65, at 458 (5th ed.1984). For example, we have said that contributory negligence is negligence by a plaintiff that unites with the negligence of the defendant to make the damage the direct result of both the defendant's negligence and the plaintiff's contributory negligence. *See Wells v. Sears*, 136 Me. 160, 164, 4 A.2d 680, 682 (1939). We have also stated that contributory negligence has to antedate or be concurrent with the defendant's negligence. *See Crosby v. Plummer*, 111 Me. 355, 357, 89 A. 145, 146 (1913). When the plaintiff commits negligence after the defendant's negligence or fails to take steps to avoid the consequences of defendant's negligence, the amount of damages may be affected, but not the plaintiff's right of recovery. *See Isenman v. Burnell*, 125 Me. 57, 61, 130 A. 868, 870 (1925).

[¶ 25] A classic application of the avoidable consequences doctrine is made when the plaintiff fails to seek medical treatment after being injured by the defendant. *See Michaud v. Steckino*, 390 A.2d 524, 531 (Me.1978); JACK H. SIMMONS ET AL., MAINE TORT LAW § 19.01, at 667 (1999). In medical malpractice actions in Maine, however, we have held that if a plaintiff's failure to follow the reasonable instructions of the defendant doctor directly contributes to the plaintiff's damages, the plaintiff's contributory negligence will bar recovery. *See Merrill v. Odiorne*, 113 Me. 424, 425, 94 A. 753, 753–54 (1915); *see also* Harvey v. Mid–Coast Hosp., 36 F.Supp.2d 32, 37 (D.Me.1999) (discussing Maine medical malpractice cases). This seems to be contrary to the majority rule. *See Durphy v. Kaiser Found. Health Plan of Mid–Atlantic States, Inc.*, 698 A.2d 459, 467 (D.C. 1997) ("The majority of courts appear to hold that contributory negligence for a patient's noncompliance with medical treatment decisions will bar recovery completely only if the patient's negligent acts are contemporaneous with the physician's negligent acts.").[6] Under the comparative negligence statute, we approved, without discussion, a jury instruction on comparative negligence when the plaintiff failed to keep a follow-up appointment with the defendant doctor. *See Hauser v. Bhatnager*, 537 A.2d 599, 601 (Me.1988).

■ [¶ 26] Although it is tempting to fully examine the rationale for applying comparative negligence as opposed to the doctrines of mitigation or avoidable consequences, we need not do so in this case. That is because, for this case, the end result is the same. Courts and commentators have discussed the similarity between applying contributory or comparative negligence and applying the doctrine of avoidable consequences. *See Ostrowski v. Azzara*, 111 N.J. 429, 545 A.2d 148, 153–54 (1988) (warning against allowing the vari-

---

6. There is no uniformity among other jurisdictions on the question of whether the patient's failure to follow a physician's instructions is comparative negligence or comes under the doctrine of mitigation or avoidable consequences. *Compare Bryant v. Calantone*, 286 N.J.Super. 362, 669 A.2d 286, 289 (App.Div.1996) (holding that patient's failure to ask dentist for medication or failing to consult with cardiologist goes to mitigation of damages, not comparative negligence) *with McMullen v. Vaughan*, 138 Ga. App. 718, 227 S.E.2d 440 (.1976) (finding that post-operative failure to return for follow-up visits and undergo physical therapy constituted negligence to be compared with surgeon's negligence). *See also* Sharon W. Murphy, Comment, *Contributory Negligence in Medical Malpractice: Are the Standards Changing to Reflect Society's Growing Health Care Consumerism?* 17 U. DAYTON L.REV. 151 (1991); Madelynn R. Orr, Comment, *Defense of Patient's Contribution to Fault in Medical Malpractice Actions*, 25 CREIGHTON L.REV. 665 (1992). In some comparative negligence jurisdictions, the failure to mitigate damages or avoid consequences is defined as fault. *See, e.g., Cox v. Lesko*, 263 Kan. 805, 953 P.2d 1033 (1998); *Love v. Park Lane Med. Ctr.*, 737 S.W.2d 720 (Mo.1987).

ous aspects of tort doctrine to do double duty); KEETON, supra at 459. Both allow a jury to reduce the plaintiff's damages or return a verdict for the defendant if the jury finds that the plaintiff was negligent or failed to mitigate or avoid consequences.

[¶ 27] One principle that ought to be plain is that a defendant is not entitled to a double reduction of damages; that is, the same action or inaction of the plaintiff that justifies a comparative negligence instruction should not also authorize a reduction of damages under the doctrine of mitigation or avoidable consequences. The fact that Walter did not call her doctor as soon as she discovered the bruising and skin rash ought not to lower damages by apportioning fault under the comparative damages statute and be used again by a factfinder to reduce damages because Walter failed to avoid the consequences of Wal–Mart's negligence. The jury should not be instructed on both comparative negligence and mitigation of damages for the same act of the plaintiff. The major difference between the two instructions is that the jury is told in the comparative negligence instruction that if the plaintiff's fault is equal to or greater than the defendant's fault, the plaintiff recovers nothing.[7] It is possible that with a mitigation instruction a jury could return a verdict for the defendant by finding that failure to avoid the consequences was so substantial that the damages should be reduced to nothing. *See* RESTATEMENT (SECOND) OF TORTS, § 918, cmt. b (1979) (noting that "a person who fails to avert the consequences of a tort, which he could do with slight effort is entitled to no damages"). The jury, however, should not be so instructed

unless the facts warrant. In this case there were not sufficient facts from which a jury could find that Walter's inaction was so substantial as to allow a verdict for the defendant.

[¶ 28] The jury was instructed on mitigation and told that every person who is injured has a duty to exercise reasonable care to reduce the extent of the injuries and to take reasonable and prudent steps to effect a cure or reduce the severity of the injury. Although the words "fault" or "negligence" are not used in the mitigation instruction, the practical effect is the same as though the words were used because of the reasonableness standard that the jury is told to apply. "The factors determining whether an injured person has used care to avert the consequences of a tort are in general the same as those that determine whether a person has been guilty of negligent conduct . . . ." RESTATEMENT (SECOND) OF TORTS, § 918, cmt. c (1979).

[¶ 29] With regard to the bruising and skin rash, the evidence is that the bruising appeared only a few days before Walter attempted to reach Dr. Ross. There is no evidence that if the bruising and skin rash been reported to Dr. Ross earlier, treatment could have been given immediately that would have reversed the effects of the wrong medicine. At best, the jury could infer that Dr. Ross would have stopped the medication a few days earlier and perhaps the effects of the wrong medication may have been lessened. A jury, acting rationally, could not have concluded that the negligence of Walter was equal to or greater than Wal–Mart's

7. In the standard comparative negligence instruction, the jury is told that if they find that the plaintiff was negligent and the plaintiff's negligence was a legal cause of her damage, the jury should apportion the relative degree of fault by comparing the fault of each. *See* 14 M.R.S.A. § 156 (1980); DONALD G. ALEXANDER, MAINE JURY INSTRUCTION MANUAL § 7–40 at 7–53.8 (3d ed.1999). The jury is further instructed that if the parties are equally at fault or the plaintiff is more at fault than the defen-

dant, they are to return a verdict for the defendant, but if the defendant was more at fault than the plaintiff they reduce the total amount of damages that the plaintiff would be entitled to by a just and equitable amount. *See id.* In the mitigation instruction the jury is told that every person who is injured has a duty to exercise reasonable care to reduce the extent of the injury and to take reasonable steps to effect a cure or reduce the severity of the damage. *See* ALEXANDER, § 7–65 at 7–92.

negligence. Because the jury was fully instructed on mitigation of damages and because the only rational effect of a comparative negligence instruction would have duplicated a mitigation instruction, there was no harm or prejudice to Wal–Mart by the court's refusal to give a comparative negligence instruction and directing a verdict for Walter on liability.

### 3. Walter's Delay in Having her Blood Tested

■ [¶ 30] Although Wal–Mart has not argued that Walter's delay in obtaining the blood test was negligence, the same reasoning applies to the blood test as to the failure to report immediately the bruising and skin rash. Wal–Mart's expert testified that Walter could not be blamed for waiting twenty-three days for the blood test because she did not know the significance of a blood test. He testified that only if a patient is given a specific appointment for the blood test, which Walter was not, and then failed to keep that appointment could she be faulted. Dr. Ross did not tell Walter the importance of the blood test. Walter should not and could not be expected to know the medical significance of the blood test. Thus, not only was there no evidence from which the jury could find that Walter was negligent in this regard, no jury, acting rationally, could conclude that a delay in obtaining the blood test was negligence equal to or greater than Wal–Mart's negligence. That being so, the only possibility left to a jury was a reduction in damages, and the mitigation instruction fully gave the jury the ability to reduce damages.

### III. WAL–MART'S MOTION FOR JUDGMENT AS A MATTER OF LAW

■ [¶ 31] Wal–Mart moved for judgment as a matter of law on the ground that Walter failed to present any expert evidence on the pharmacist's standard of care. It points out that Lovin was not designated as an expert. In this case the testimony of an expert was not necessary. We have said that where professional negligence and its harmful results "are sufficiently obvious as to lie within common knowledge" no expert testimony is necessary. *Jim Mitchell and Jed Davis, P.A. v. Jackson*, 627 A.2d 1014, 1017 (Me.1993) (quoting *Cyr v. Giesen*, 150 Me. 248, 252, 108 A.2d 316, 318 (1954)). The negligence of the pharmacist and the harmful results were sufficiently obvious to be within the common knowledge of a lay person. It does not take an expert to know that filling a prescription with the wrong drug and failing to take the steps in place in that pharmacy to check for the wrong drug is negligence.

### IV. WAL–MART'S MOTION FOR MISTRIAL

[¶ 32] Wal–Mart moved for a mistrial because of three comments made by Walter's counsel during closing argument. First, Walter's attorney stated that the pharmacist attempted to accept responsibility but his employer, Wal–Mart, refused to accept responsibility for Walter's injury. Wal–Mart objected, and the objection was sustained. The court admonished counsel that the only issue was damages and told the jury that they were not to be swayed by any bias or predisposition towards one party or the other. Second, Walter's counsel said that Walter was sent home "not with the smilely face as we hear about at Wal–Mart ... but with a bottle of poison ... a bottle of medication that was not meant for her." Wal–Mart objected and moved for a mistrial. The motion was denied, and the judge told the jurors that the issue was damages. Third, while referring to the amount of damages the jury could award, during rebuttal, Walter's counsel told the jury it should consider how much money professional basketball players are paid. Wal–Mart objected and the objection was sustained. Wal–Mart argues that the effect of the three comments was to prejudice the jury against

Wal–Mart so that it would punish Wal–Mart by the amount of damages.

[¶ 33] We review a refusal to grant a motion for a mistrial for abuse of discretion. *See Sheltra v. Rochefort,* 667 A.2d 868, 871 (Me.1995). The judge sustained the objections to the comments, told the jurors to ignore the comments, and gave curative instructions. The trial judge did not abuse his discretion in refusing to grant a mistrial because of Walter's comments during closing argument.

## V. WAL–MART'S MOTION FOR NEW TRIAL

[¶ 34] After the verdict Wal–Mart moved for a new trial arguing that the verdict must be vacated because the damages amounted to an award of punitive damages. Wal–Mart further contends that the damages were excessive and the size of the verdict demonstrates that the judge and jury were biased against Wal–Mart.

[¶ 35] "When a court refuses to grant a new trial on the ground of an excessive damage award, the ruling will not be reversed except for clear and manifest abuse of discretion." *Gilmore v. Central Maine Power Co.,* 665 A.2d 666, 670 (Me.1995). Evidence must be construed in the light most favorable to the jury verdict, and a damage award will not be overturned unless it "is without rational explanation." *Cope v. Sevigny,* 289 A.2d 682, 684 (Me.1972); *see Michaud,* 390 A.2d at 536.

[¶ 36] Walter's total medical bills and expenses equalled $71,042.63. The jury awarded Walter $550,000 in damages. Presumably, the additional $479,000 of Walter's recovery is in compensation for her pain and suffering. The jury heard several witnesses, including Walter herself,

testify about the painful treatment she received in the hospital, the long recovery process, and the continuing difficulties she faces. In light of this evidence, which must be considered favorably to Walter, the jury's award of damages is rational. "Although the verdict may seem large, it reflects the considered opinion of the jury within the range of evidence of sufficient probative character...." *Michaud,* 390 A.2d at 537 (quoting *Fotter v. Butler,* 145 Me. 266, 273, 75 A.2d 160, 164 (1950)).

[¶ 37] Punitive damages were never an issue in this case. They were not requested by Walter. They were not mentioned during the arguments of counsel, and no instructions were given from which the jury could have awarded any damages other than compensatory damages. The court did not abuse its discretion in refusing to grant a new trial because of the amount of damages.

[¶ 38] Wal–Mart, argues that certain conduct of the trial judge contributed to an excessive verdict, and for that reason, the verdict cannot stand. The complained of conduct of the trial judge consists of two incidents: (1) during the trial, but at a time when the jury was not present, the judge exited the courtroom after ruling on certain jury instructions and left counsel with the court reporter so that counsel could make further arguments on an instruction for the record; and (2) after the verdict was returned, the judge made an unseemly comment to the jurors. Because the first conduct complained of by Wal–Mart took place outside of the presence of the jury, it could not have contributed to the amount of the verdict. While we do not condone this conduct by the judge,[8] it did not demonstrate bias toward one party or the other. Both parties were put in the same position of making their

---

8. Judges have a responsibility to give every party "the right to be heard according to law." MAINE CODE OF JUD. CONDUCT CANON 3(B)(7) (1999). Parties must be given the opportunity to make their arguments to the court. This does not mean that judges have to allow counsel to make lengthy or repetitious arguments. Once counsel have stated their objections to the proposed instructions and the court has ruled, there is no need to allow counsel additional time with the court reporter to repeat their arguments.

arguments for the record outside of the presence of the judge.

[¶ 39] The second action by the judge occurred after the verdict was returned. The judge, in thanking the jury members for their service, said that the jury had sent "a message about the duty and care of a pharmacist." The judge went on to say that it was a step "we took together." While it is appropriate for a judge to thank jurors for their service, the judge must take pains to remain neutral. Judges "shall perform judicial duties without bias or prejudice" and "shall not commend or criticize jurors for their verdict" except in an opinion or court order. MAINE CODE OF JUD. CONDUCT CANONS 3(B)(5) and (10) (1999). Telling the jury that it had sent a message and suggesting that both the judge and the jury had worked together in doing so allows for a perception that the judge lacked neutrality. This particular comment had no effect on the verdict because it was made after the verdict was returned. Although it is possible that such a comment could have the effect of illuminating other judicial comments or verifying bias on the part of a judge, such was not the case here. We do not find any other comment or ruling by the judge in this proceeding to convey judicial bias or prejudice. This statement by the judge did not "demonstrate a deep-seated favoritism or antagonism that would make fair judgment impossible." *In re William S.*, 2000 ME 34, ¶ 9, 745 A.2d 991, 995. We conclude that the judge's statement to the jury, while improper, is not enough in and of itself to support Wal-Mart's contention that the judge was, in fact, prejudiced or biased against Wal-Mart in this case.

The entry is:

Judgment affirmed.

WATHEN, C.J., with whom RUDMAN and DANA, JJ., join, concurring.

[¶ 40] I concur in the result, but I reach that result on different grounds. It is problematic whether a judgment as a matter of law in favor of a plaintiff in a negligence action can ever be upheld in the absence of a testimonial confession by the defendant or an admission by counsel. *See Lewis v. Knowlton*, 1997 ME 12, 688 A.2d 912. In my judgment, defense counsel in this case admitted liability in his opening statement when he told the jury that Wal-Mart had never denied liability and that the only issue concerned the amount of fair and just compensation. Having made that statement, he then sought to try the issue of liability behind the jurors' backs. To countenance such a strategy would be to ignore the requirement of the Maine Bar Rules that trial counsel employ "such means only as are consistent with truth, and shall not seek to mislead the . . . jury . . . by any artifice or false statement of fact or law." M. Bar R. 3.7(e)(1)(i). I would affirm the judgment on the basis that defense counsel admitted liability.