HERMAN CYR, PRO AMI
*vs.*
JOSEPH H. GIESEN

LEON CYR
*vs.*
JOSEPH H. GIESEN

Kennebec.   Opinion, October 13, 1954.

*Jerome G. Daviau,* for plaintiffs.

*Locke, Campbell, Reid and Hebert,* for defendant.

SITTING: FELLOWS, C. J., WILLIAMSON, TIRRELL, WEBBER, TAPLEY, JJ. BELIVEAU, J., did not sit.

TAPLEY, J. On exceptions to the granting of a nonsuit in each case.

Herman Cyr, a young man of nineteen years of age, brought an action against the defendant, Joseph H. Giesen, a physician, alleging negligence, and the father, Leon Cyr, brought his action for expenses. The cases were tried together at the October Term, A. D., 1953, of the Superior Court for the County of Kennebec and State of Maine before a jury. Consideration is given to the case of Herman Cyr because upon the determination of his case rests that of his father, Leon Cyr. Plaintiff has the burden of proving first that the defendant was negligent and, second, that his negligence was the proximate cause of the injury. If he fails in his proof to maintain either of these propositions, there is no question for jury determination.

Herman Cyr sustained a trans-cervical fracture of the neck of the left femur (thigh bone) on the twenty-third day of February, A. D., 1949. Immediately following the injury he was taken to the hospital where he was attended by one Dr. Ovide Pomerleau who called in Dr. Joseph H. Giesen, the defendant. Dr. Giesen then took charge of the case. Dr. Giesen on February 25, 1949 performed surgery, using the Smith-Peterson nail technique. The plaintiff remained in the hospital for a period of fifteen days and then was discharged from the hospital. A month later he returned to Dr. Giesen who took x-rays. In June, 1949, x-rays were again taken by the defendant and on the twenty-first day of June, A. D., 1949, the plaintiff went back to work and continued to work without interruption until July 31, 1951. In May of 1950 pain developed in plaintiff's left hip, lasting for three or four months and then disappeared. The pain appeared again several months later. The facts concerning these pains were not brought to the attention of the defendant until August, 1951, when the plaintiff went to the defendant and submitted to surgery, whereby the Smith-

Peterson nail was removed. This operative procedure occurred on August 10, 1951, and the plaintiff was discharged from the hospital August 28, 1951. A cast was applied to plaintiff's left leg at that time which he wore for eight and one-half months, during which time defendant caused x-rays to be taken every two months. Defendant treated plaintiff during this period. X-rays taken July 31, 1951, indicate early evidence of aseptic necrosis of the left femoral head.

A summary of plaintiff's allegations is as follows:

1. Defendant failed to inform the plaintiff of all the advantages and disadvantages of treating the fractured hip with a Smith-Peterson nail and that the defendant failed to recognize the limitations for perfect immobilization in the use of the Smith-Peterson nail from the reading of the x-ray.

2. Defendant failed to use his best judgment in the use of the Smith-Peterson nail; to use the latest approved method and technique; to bring about the proper type of apposition of the bone fragments in the reduction of the fracture; to take proper steps that were available to him by not resorting to bone pegging, osteotomy or to the drilling of holes in the femoral neck for the purpose of promoting blood circulation.

3. Defendant failed in his post operative care in not taking sufficient x-rays in order to acquaint himself with the progress or lack of progress of the union of the fractured femur and of any necrosis or ankylose condition that might have developed.

The defendant filed a plea of general issue with a brief statement alleging as special matter of defense that he was confronted with a very rare and difficult fracture; that the surgical technique which he used was proper in the light of modern orthopedic surgery; that proper union and a com-

pletely healed fracture was procured and that the diseased condition of the head of the femur was not caused by any violation of proper treatment on defendant's part.

Counsel for plaintiff concedes that the surgery as performed by the defendant in the reduction of the fracture was proper but maintains his complaint as to alleged negligent post operative care on the part of the defendant.

The record discloses that the plaintiff presented as his evidence the testimony of three witnesses, being himself, Dr. Paul J. Gephart, an osteopathic physician, and Dr. A. Leo Brett, an orthopedic surgeon. In addition to the testimony of these witnesses, there appears exhibits in the nature of hospital records, x-rays and medical reports.

The testimony of the plaintiff in so far as the medical aspect of this case is concerned is not of any probative force excepting as to those subjective symptoms that may have been present. This case must be analyzed entirely from the standpoint of the medical testimony as given by the doctors and evidenced by the exhibits.

The medical facts in this case are such that they come within the realm of expert testimony and must be considered on that basis.

The recognized and accepted rule is that expert evidence is essential to sustain an action for malpractice against a physician or surgeon.

*70 C. J. S., page 1006:*

"Professional testimony alone should be looked to for matters of fact or opinion peculiarly within the learning and experience of professional witnesses. Thus, where the exercise of proper skill or care on the part of a physician or surgeon is in issue, expert medical testimony is ordinarily essential. Accordingly, expert testimony is ordinarily required to establish the prevailing standard

> of skill and learning in the locality, and expert testimony is required to establish usual or proper practice in medical treatment, the propriety of particular conduct of the practitioner, and want of professional skill; and such testimony, although not conclusive in the sense that it must be accepted as true, is conclusive as against that of lay witnesses where the matter in issue is within the knowledge of experts only, and not within the common knowledge of laymen."

The exception to the rule is that under some circumstances where the negligence and harmful results are sufficiently obvious as to lie within common knowledge, a verdict may be supported without expert testimony.

The case under consideration concerns such technical and involved medical procedure that it rules out any possibility of understanding on the part of a layman as to its medical nature and it is therefore self evident that this is not a case falling within the exception of the general rule relating to expert medical testimony in malpractice cases.

We start with the premise that the defendant performed the operation in a proper manner. This fact is not only disclosed by the evidence but also admitted by the plaintiff's counsel. It is also evident that following the insertion of the Smith-Peterson nail nature progressed in a normal way, bringing about a proper union of the fracture line. The plaintiff then returned to his employment which he continued without interruption for a little more than two years, during which time the defendant was not consulted or advised of any trouble that the plaintiff may have been experiencing as a result of the fracture.

In considering the medical evidence, we must look to the testimony of Dr. Paul J. Gephart, an osteopathic physician who was testifying in the capacity of a specialist in x-ray, and to that testimony of Dr. A. Leo Brett, a recognized authority on orthopedic surgery.

The apparent purpose of the testimony of Dr. Gephart was to show from the x-rays the development of aseptic necrosis and that it could have been either prevented or its progress retarded if the defendant had followed post-operative conditions by medium of x-ray. Testimony of Dr. Gephart appears in the record relative to the presence of necrosis of the head of the femur in June, 1950, some fifteen months after the operation.

"Q. As long as you have the x-ray up—one other thing, Dr. Gephart, in regard to it—this being #16 with #13 in parenthesis, that is, #13 on the white paper, that is the 1950 x-ray which you have just described, in June. Do you bear in mind, please, that in the evidence introduced by the plaintiff here as original evidence of the truth therein stated, there is a history and statement by this man given to Dr. Giesen in 1951, that the last of May of 1950 you see, the last of May before this x-ray was taken in June—he had rheumatism following getting his feet wet and had some pain. Will you bear in mind that history coming from the plaintiff?

A. Yes, sir.

Q. Will you look at the x-ray and see if you find any evidence which warrants a diagnosis of necrosis, or at least requires a diagnosis of necrosis of the head of that femur in 1950? Take your time and look it over. May I add one thing more, Doctor? View it in the light as if you were looking at it in 1950 and not by hind-sight in the light of what you find in 1951 or 1952. Do you understand what I mean?

A. Yes, sir. I don't see any evidence of any bone pathology.

Q. Would the statement in the record of this plaintiff which has been put in, that that x-ray of 6-28-50 revealed the fracture site is

well healed. There are no areas of softening or destruction and the nail is well placed. There is no action whatever about the nail. Is that a fair statement?

A. Yes, sir."

Dr. A. Leo Brett, admittedly a specialist in orthopedic surgery, testified for the plaintiff and, upon his testimony primarily, the plaintiff must base his case. The material and relevant testimony of Dr. Brett, as developed on cross-examination, appears in the record in the following words:

"Q. Now then, the first time we have any indication of necrosis here is in July, 1951, when this boy quit work at the mill where he had been for two years steady, and came to the doctor; do you remember that?

A. Yes.

Q. And then from the x-rays you have examined, and then for the first time there was evidence of it; isn't that true?

A. That is right.

Q. And you stated in direct examination at that time when the x-ray was taken, July 31st, it showed early evidence of aseptic necrosis?

A. That is right.

Q. By 'early' you mean just started, or something of that sort?

A. Well, I don't know how long it had been going, but it had not involved the whole head.

Q. No. It had not accomplished that?

A. No.

Q. Now then, the treatment given by the doctor from then on, as you have seen from the record which the plaintiff has offered, and heard from the plaintiff on the stand, consisted of the cast and the correction of an adduction

and the flexion deformity in the leg; do you recall that?

A. Yes."

\* \* \* \* \* \* \* \* \* \* \*

"Q. So it was a proper and wise and good practice thing to do, wasn't it?

A. That is right."

\* \* \* \* \* \* \* \* \* \* \*

"Q. Now then, in all this story can you find any bad practice on the part of this doctor which has caused any damage to this plaintiff here?

A. I know of no evidence of it.

Q. Regardless of academic questions of chasing x-rays?

A. That is right."

\* \* \* \* \* \* \* \* \* \* \*

"Q. Now then, we make our contentions regarding the aseptic necrosis, but I have been all over that with you and don't want to repeat it; but do you find or have any question there is any breach of good practice by this surgeon here on this history that has caused any damage to this plaintiff?

A. I don't know of any."

In view of all the evidence, has the plaintiff raised an issue for a jury determination of the factual questions of negligence and proximate cause?

The legal responsibility of the defendant to the plaintiff is well and clearly defined in the case of *Coombs* v. *King*, 107 Me. at 378, where the court said:

"The measure of a physician's legal responsibility has been stated many times by this court. He contracts with his patient that he has the ordinary skill of members of his profession in like situation, that he will exercise ordinary or reasonable care and diligence in his treatment of the case, and that

he will use his best judgment in the application of his skill to the case. ***** The physician is not an insurer. He does not warrant favorable results. If he possesses ordinary skill, uses ordinary care, and applies his best judgment, he is not liable even for mistakes in judgment. Medical science is not yet, and probably never can be, in many respects, an exact, certain science." ********

"The rule of liability is not a hard one, it is a reasonable one. And the burden is on the plaintiff to show a malpractice."

See *Emery* v. *Fisher*, 128 Me. 453.

The testimony of the plaintiff has no probative force on the question of negligence.

The medical testimony, particularly that of Dr. Brett, was obviously presented for the purpose of proving plaintiff's claims in his declaration that defendant was negligent in the performance of the operation and post operative care of the plaintiff and that the alleged negligence was the proximate cause of the injury complained of by the plaintiff.

In the case of *Glazier* v. *Tetrault*, 148 Me. at 132, the late Chief Justice Murchie sets out the established principles of law in the matter of nonsuit when he says:

"There are two firmly established principles of law which support the action taken in the Trial Court in these cases. The first is that a mere scintilla of evidence will not support a factual finding. Connor v. Giles, 76 Me. 132; Nason v. West, 78 Me. 253, 3 A. 911; Adams v. Richardson, 134 Me. 109, 182 A. 11; Bernstein v. Carmichael, 146 Me. 446, 82 A. 2d. 786. As Chief Justice Peters stated it in Connor v. Giles, supra:

'a jury cannot be permitted to find there is evidence of a fact when there is not any.'

The other is that conjecture is not proof. Alden v. Maine Central Railroad Co., 112 Me. 515, 92 A. 651; Mahan v. Hines, 120 Me. 371, 115 A. 132;

Bernstein v. Carmichael, supra. As was said in Mahan v. Hines, supra, when a plaintiff seeks to prove his case by inferences 'drawn from facts,' the facts themselves must be proved.

'Inferences based on mere conjecture or probabilities'

cannot support a verdict, and when nothing more is presented by a plaintiff, the principle heretofore noted is applicable —a non-suit is in order."

Upon the completion of plaintiff's case, there was not sufficient evidence, taken in its most favorable light to the plaintiff, upon which a jury could base an inference of legal liability on the part of the defendant.

Nonsuit was properly ordered in each case.

*Exceptions overruled in each case.*