2000 ME 118

**Judith A. SEIDER**

v.

**BOARD OF EXAMINERS OF PSYCHOLOGISTS.**

Supreme Judicial Court of Maine.

Argued March 6, 2000.

Decided June 23, 2000.

Christopher C. Taintor, (orally), Norman, Hanson & DeTroy, Portland, for plaintiff.

Andrew Ketterer, Attorney General, Judith M. Peters, Asst. Attorney General (orally), Augusta, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

DANA, J.

[¶ 1] Judith Seider appeals from the judgment entered in the Administrative Court (*Beaudoin, C.J.*) affirming the decision and order of the Board of Examiners of Psychologists finding that she had violated four provisions of the Ethical Principles and Code of Conduct of Psychologists of the American Psychological Association[1] (EPCC) and that those violations constituted negligence pursuant to 32 M.R.S.A. § 3837(8).[2] On appeal, Seider argues (1) the Board was required to introduce expert testimony to establish the governing standards of care, and that its failure to do so violated her due process rights; (2) there was an "undue delay" between the investigation of the complaint against her and the hearing on the merits; and (3) there was insufficient evidence in the record to support the Board's findings. We affirm.

1. The EPCCs Seider was found to have violated are as follows:

    **1.23(b).** When psychologists have reason to believe that records of their professional services will be used in legal proceedings involving recipients of or participants in their work, they have a responsibility to create and maintain documentation in the kind of detail and quality that would be consistent with reasonable scrutiny in an adjudicative forum.
    **4.01(a).** Psychologists discuss with clients or patients as early as is feasible in the therapeutic relationship appropriate issues, such as the nature and anticipated course of therapy, fees, and confidentiality.
    **401(d).** Psychologists make reasonable efforts to answer patients' questions and to avoid apparent misunderstandings about therapy. Whenever possible, psychologists provide oral and/or written information, using language that is reasonably understandable to the patient or client.
    **409(a).** Psychologists do not abandon patients or clients.

2. Section 3837 states in pertinent part as follows:

    The board may suspend or revoke the license of a psychological examiner or psychologist pursuant to Title 5, section 10004. The board may refuse to issue or renew or the Administrative Court may suspend, revoke or refuse to renew the license of a psychological examiner or psychologist on any of the following grounds:
    . . . .
      **8. Negligence.** Negligence in the performance of his duties.
    32 M.R.S.A. § 3837(8) (1983).

## I. CASE HISTORY

[¶ 2] As a result of a court order amending the divorce judgment that had ended her marriage, Seider's patient was granted sole custody of her child. Her former husband was granted visitation. The custody order also required the parties to obtain individual and joint counseling for issues surrounding their divorce and their ability to communicate and co-parent their child. To satisfy her individual counseling obligation, the patient, on her attorney's recommendation, contacted Seider and entered into a therapeutic relationship with her.

[¶ 3] The patient's first session with Seider included a discussion of the history of abuse the patient had suffered at the hands of her husband and her need for help with her lack of assertiveness and low self-esteem. Based on the information conveyed to her in that session, Seider expressed the view that any visitation by the father with the couple's son should be supervised. This view was subsequently discussed with Lillian Kennedy, the patient's attorney in the divorce proceeding.

[¶ 4] Pursuant to Seider's recommendation, and as a result of subsequent therapeutic sessions Seider had with both the patient and her son, the patient filed a

motion on April 29, 1993, to limit the father's visitation by requiring that visits be supervised. It was understood at that time that Seider would provide expert testimony on behalf of the patient.

[¶ 5] In the months leading up to the hearing on the motion, however, a series of events took place that culminated in Seider making herself unavailable to testify at the hearing. In addition, Seider failed to provide the records of the patient or her son to either the patient or Kennedy.[3]

[¶ 6] During the hearing before the Board, the following evidence was presented. Kennedy explained that she had participated in a lengthy discussion with Seider prior to the hearing concerning her anticipated testimony. In the course of that discussion Kennedy promised to contact Seider following a pretrial conference, at which she expected to learn of the trial date set for the hearing. She also requested that Seider send the client treatment records so that she could prepare for the hearing. Seider never sent the records.

[¶ 7] Following the conference, Kennedy called Seider and left a message on her answering machine advising her that the hearing had been scheduled for July 9. Seider did not respond to this message.

[¶ 8] Kennedy next sent a letter to Seider, dated June 17, asking when she would be available to meet to discuss her testimony for the hearing. Again, Seider did not respond. Knowing the hearing was scheduled in two weeks, Kennedy decided to subpoena Seider and one was issued on June 25.

[¶ 9] On the morning of July 2, having still received no response from Seider, Kennedy asked her secretary to telephone Seider and request that she respond be-

cause it was an emergency. At the end of that day, having still received no response, Kennedy went to Seider's home, to which her office was attached, and stuck her business card in the door with a message asking Seider to call her.

[¶ 10] Either that night or the next day, Seider finally responded by leaving a message on Kennedy's answering machine that she was going to the Dana Farber Institute because she needed to take care of herself and therefore would not be available on the day of the hearing.[4] In response, Kennedy telephoned Seider on July 4 and left a message asking Seider to let her know if it would be possible to take her deposition. Seider did not respond.

[¶ 11] On the day following the holiday weekend, Kennedy arranged a conference call with the court and opposing counsel during which she sought a continuance of the hearing. After Kennedy explained the difficult situation involving Seider, the court denied the continuance. In addition, the court ordered Kennedy to obtain the client records from Seider for opposing counsel's review.

[¶ 12] Attempting again to obtain the records from Seider, Kennedy drafted a letter on July 6 requesting that she release them. Although the patient had already provided Seider a signed release, Kennedy enclosed another. As the hearing date was near, and in an attempt to expedite the release of the records, the patient volunteered to deliver the letter and second release to Seider's office that day. Based on Seider's previous message, neither Kennedy nor the patient expected her to be in her office at the time of delivery.

[¶ 13] When the patient arrived at Seider's office, she discovered that Seider was in her office seeing patients. This surprised the patient because Seider had stat-

---

3. In her brief, Seider notes several times the patient's success with respect to her motion. Although it appears that, in doing so, Seider is attempting to demonstrate that the patient was not harmed by her behavior, the patient's success on her motion is irrelevant. The pa-

tient's success would not excuse Seider's violation of the EPCCs that she is bound to uphold.

4. When the issues arose regarding Seider's health, Kennedy recalled the subpoena.

ed that she was going to be at Dana Farber receiving treatment. When the door to her office opened, Seider saw the patient sitting in her waiting room and motioned for her to enter. Seider demanded to know the reason the patient had come to her office and informed her that she had breast cancer and had to take care of herself. When she learned of the content of the letter the patient was there to deliver, Seider initially attempted to refuse to accept it. When the patient said she would not take the letter back, Seider took it but stated she was disappointed in both the patient and Kennedy.

[¶ 14] Seider then called Kennedy's office and expressed her anger. As Kennedy was not present when she called, Seider left a message stating, *inter alia*, that she was very upset by the patient's appearing at her office and that she could not believe that Kennedy would permit the patient to do so. Seider did not contact either Kennedy or the patient again.

[¶ 15] In addition to complaining of Seider's failure to appear at the hearing, the patient testified concerning her dissatisfaction with the course of treatment that Seider had provided to her and her son. The patient explained that she had never engaged in individual therapy before entering into the therapeutic relationship with Seider and did not know what to expect from it. Seider, however, failed to remedy this concern. She never outlined any therapeutic goals with the patient, nor did she ever review a treatment plan with the patient during the course of her treatment.

[¶ 16] In the course of treating the patient's son, Seider never discussed what treating procedures she would employ or what therapeutic goals she expected to achieve. She never discussed the boy's

progress in therapy, nor did she ever explain to the patient the outcome of any evaluation she performed of him. On one occasion, in the course of trying to convince the patient to seek a limitation of the father's visitation rights, Seider told her that a likely consequence of the unorthodox lifestyle to which the boy's father was exposing him[5] was that he would "blow his brains out" at a later age. After providing this grim warning, Seider unfortunately failed to explain the basis of her belief.

[¶ 17] The Board concluded that Seider had violated five EPCC provisions and that, as a result, she had been negligent in her duties with respect to the patient. On appeal to the Administrative Court, it was determined that there was insufficient evidence supporting the Board's conclusion that Seider had violated EPCC provision 1.25(a).[6] The Administrative Court remanded the case to the Board for a determination as to whether the four violations remaining constituted negligence. On remand, the Board determined that Seider's conduct, notwithstanding the vacated violation, still constituted negligence. Seider filed a motion for reconsideration, which the Administrative Court denied, thereby affirming the Board's finding of negligence. Seider appeals from this order.

## II. PROCEDURAL DUE PROCESS

[¶ 18] Seider argues that the Board violated her procedural due process rights because it failed to establish, by record evidence, the standard of care she was required to provide the patient. The Board argues that it satisfied its procedural due process responsibilities to establish the standard of care Seider was required to provide by disclosing and entering in the record the EPCCs that Seider was

---

5. The father did not have a permanent residence and was staying at different times in a homeless shelter, someone's car and an abandoned mill. The father took the boy to these places during his visits.

6. EPCC provision 1.25(a) provides as follows:

As early as is feasible in a professional or scientific relationship, the psychologist and the patient, client, or other appropriate recipient of psychological services reach an agreement specifying the compensation and the billing arrangements.

charged with violating, and by informing her that findings of violations could result in a finding of negligence. We review the Board's decision directly for an abuse of discretion, errors of law, or findings unsupported by the evidence. *Balian v. Board of Licensure in Med.,* 1999 ME 8, ¶ 9, 722 A.2d 364, 366.

[¶ 19] Due process is a flexible concept calling for "such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see also Fichter v. Board of Envtl. Protection,* 604 A.2d 433, 437 (Me.1992). It requires fundamental fairness, which involves consideration of the following three factors that have been set forth by the United States Supreme Court to assess whether the state had violated an individual's right to due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and administrative burdens that the additional or substitute procedural requirement would entail.

*Balian,* 1999 ME 8, ¶ 10, 722 A.2d at 367 (quoting *Mathews,* 424 U.S. at 335, 96 S.Ct. 893 (1976)).

[¶ 20] With respect to the first *Mathews* factor, Seider's property interest in her professional license is at stake.[7] *See Balian,* 1999 ME 8, ¶ 11, 722 A.2d at 367; (due process protections implicated in proceeding to take disciplinary action against doctor's license); *Board of Overseers of the Bar v. Lefebvre,* 1998 ME 24, ¶ 15, 707 A.2d 69, 73 (due process protections implicated in hearing to suspend attorney's license).

[¶ 21] With respect to the second *Mathews* factor, we have stated that "disclosing the standard permits the licensee to assert a defense, enables both expert and lay members of the Board to evaluate the licensee's conduct, and enhances our ability to provide effective judicial review." *Balian,* 1999 ME 8, ¶ 12, 722 A.2d at 367. In the present case, the Board argues that it set forth the applicable standard for each of the five violations Seider was alleged to have committed by entering the five EPCC provisions in the record.

[¶ 22] While establishing the standard of care for licensed professionals regarding the treatment of a patient ordinarily requires expert testimony, *see Searles v. Trustees of St. Joseph's College,* 1997 ME 128, ¶ 10, 695 A.2d 1206, 1210 (citing *Forbes v. Osteopathic Hosp. of Maine, Inc.,* 552 A.2d 16, 17 (Me.1988)) ("ordinarily, a plaintiff can discharge his burden of proof for a claim of negligent medical care only by expert medical testimony establishing the appropriate standard of medical care ...."), we have long recognized that expert testimony may not be necessary "where the negligence and harmful results are sufficiently obvious as to lie within common knowledge ...." *Cyr v. Giesen,* 150 Me. 248, 252, 108 A.2d 316, 318 (1954). In the present case, the Board found the following: (1) Seider abandoned her patient when she failed to make herself available for the hearing, failed to make herself available for a deposition prior to the hearing, and failed to provide the treatment records of the patient and her son for use at the hearing; (2) Seider failed to create and maintain records regarding her treatment of the patient and her son; (3) Seider failed at all times to clear up misunderstandings the patient had with respect to the treatment of herself and her son; and (4) Seider failed to properly discuss at any time during the therapeutic relationship the nature and anticipated course of thera-

---

7. The Board's notice to Seider informed her that the purpose of the hearing was to determine whether grounds existed for the Board to take disciplinary action against her license as a psychologist.

py with the patient concerning her and her son.

[¶ 23] Expert testimony was not required to establish the appropriate standards by which to measure Seider's conduct. To the contrary, it is well within the realm of common knowledge that a complete failure to act in accordance with provisions of the code of conduct established for one's profession constitutes a violation, and that violations of numerous provisions of that code may constitute negligence. Moreover, the members of the Board possess knowledge of and are familiar with the provisions of the EPCC, as they are charged with the duty of ensuring that the members of the profession conduct themselves in accordance with those provisions. We therefore conclude that in the circumstances of the present case, the Board satisfied its obligation to introduce evidence of the appropriate standard through the admission in evidence of the applicable EPCC provisions. *See Balian*, ¶ 15, 722 A.2d at 368.

[¶ 24] With respect to the third *Mathews* factor, we are required to consider the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893 (1976). In the present case, Seider was called before the Board that governs the conduct of individuals within her profession. The members of the Board, which is comprised of both lay and professional members, are charged with a knowledge and understanding of the rules they are entrusted to enforce. Requiring expert testimony in a case involving the types of misconduct in which Seider engaged would needlessly increase the time and expense necessary for the Board to present its case. Thus, after balancing the three *Mathews* factors in the context of the present case, we conclude that the Board was not required to introduce expert testimony to establish the appropriate standard of care.

## III. UNDUE DELAY

[¶ 25] The Maine Administrative Procedure Act provides that "[t]he opportunity for hearing in an adjudicatory proceeding shall be afforded without undue delay." 5 M.R.S.A. § 9056. Seider claims that the two and one-half year gap between the conclusion of the Board's investigation of the complaint and the contested case hearing was an "undue delay" that violated her due process rights and section 9056.

[¶ 26] In deciding due process challenges based on claims of "undue delay" between the filing of a complaint and a hearing, before the Board is required to proffer an explanation, the initial burden is on the defendant to demonstrate "actual and unjustifiable prejudice." *Cf. State v. Cyr*, 588 A.2d 753, 756 (Me.1991) (citing *State v. Hutchins*, 433 A.2d 419, 423 (Me. 1981)). Only then does the court inquire of the Board as to the reasons for the delay and to determine whether the prejudiced caused by the delay remains unjustified. *Cf. id.*

[¶ 27] In the present case, Seider fails to make the initial showing of "actual and unjustifiable prejudice." Seider's license, although voluntarily permitted to lapse, was not revoked or suspended at any time prior to the hearing, nor does Seider contend that her ability to practice was hindered by the delay. Seider asserts only that a two and one-half year delay equals "undue delay ." There is, however, no evidence offered to demonstrate that the delay was the result of dilatory conduct by the Board. In fact, the record demonstrates that during a portion of this period the Board was considering other disciplinary matters with respect to earlier claims of misconduct by Seider.

[¶ 28] In addition Seider does not demonstrate that she was prejudiced in any way by the delay. As stated above, her license had not been suspended or revoked prior to the hearing. Seider does

not argue that any evidence was lost or that any material witnesses were no longer available. In fact, the only relevant evidence claimed to have been lost was the patient records that Seider claimed to have lost during her move to another state. Accordingly, the Board's delay in holding a hearing with respect to the patient's complaint did not violate Seider's due process rights in the present case. *See, e.g., Ansell v. Board of Examiners of Mortuary Science,* 222 Mich.App. 347, 564 N.W.2d 519, 525–26 (1997) (four year lapse between issuance of complaint and evidentiary hearing was not an "undue delay").

## IV. SUFFICIENCY OF THE EVIDENCE

[¶ 29] Seider argues that the Board failed to produce sufficient evidence that she violated the EPCC provisions and that, as a result, she acted negligently. We do not substitute our judgment for that of an administrative board and we affirm findings of fact if they are supported by substantial evidence in the record. *See International Paper Co. v. Board of Envtl. Protection,* 1999 ME 135, ¶ 29, 737 A.2d 1047, 1054. "We examine the entire record to determine whether, on the basis of all the testimony and exhibits before it, the [Board] could fairly and reasonably find the facts as it did." *Id.* Our review of the record reveals that there is substantial evidence supporting the Board's findings that Seider violated the relevant EPCC provisions, and that her violations constituted negligence.

The entry is:

Judgment affirmed.