# United States Court of Appeals
## For the First Circuit

No. 16-2176

ANNALIA MONTANY,

Plaintiff, Appellant,

v.

UNIVERSITY OF NEW ENGLAND and SCOTT MCNEIL,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

John J.E. Markham, II, with whom Markham & Read was on brief,
for appellant.
Edward M. Kaplan, with whom William D. Pandolph and Sulloway
& Hollis, P.L.L.C. were on brief, for appellees.

May 30, 2017

**THOMPSON**, **Circuit Judge**.  Annalia Montany appeals from the entry of summary judgment in favor of the University of New England (UNE) and Scott McNeil (collectively, defendants).  We affirm.

## BACKGROUND[1]

Montany was a student in UNE's two-year occupational-therapy master's degree program.  The program requires its students to take practical exams, in which program instructors act as mock patients and students are tested on their ability to properly manage a patient in need of occupational therapy.  In one of these practical exams, Montany was tasked with assisting McNeil — an instructor playing the role of a mock patient who was "unable to ambulate" and was "very weak, and unable to bear much weight into the legs" — in a transfer from a wheelchair into a bed.  According to Montany, while she was assisting McNeil in the transfer, McNeil intentionally "dropped his weight" (210 pounds) in "a fake slipping" or "falling movement."[2]  Montany suffered a back injury

---

[1] In this summary-judgment appeal, we view the facts (and all reasonable inferences that can be drawn from them) in the light most favorable to Montany, the nonmovant.  See Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 312 (1st Cir. 2016).  We set forth here only those facts necessary to provide the general backstory, amplifying this factual background when necessary in the course of our analysis.

[2] In her opening and reply briefs, Montany repeatedly asserts that McNeil instructed her to hold on to a gait belt during this transfer.  However, the record passages cited for support show only that Montany was holding a gait belt during the transfer, not that McNeil instructed her to do so.  Nonetheless, because it makes

-2-

as a result, although she did not report this injury to McNeil at this time. Montany did not achieve the minimum passing score on this practical exam. According to Montany, she told McNeil three days after failing this practical exam that her "back hurts." Five days after that, Montany took a retake of the practical exam for the course; it is undisputed that she did not tell McNeil or any other instructor at UNE that she could not retake the practical exam because of any back problem. She failed the retake exam as well, and so did not receive a passing grade for the course.

As a result of this failing grade, the program's Student Development Committee (SDC) intervened. During her initial meeting with the SDC, Montany did not report that she had injured her back or relate that her failure of the retake of the practical exam was a product of her back injury. The SDC developed a plan (SDC plan) for Montany that provided, in pertinent part, that, "[d]epending on her GPA and progress in other courses this fall, she may return [for the following fall semester] on academic probation to re-take [the failed course] or be dismissed" and that "she needs to keep her GPA high in other courses to meet the 3.00 semester criterion." In a later meeting with the SDC, she reported the back injury she suffered in the practical exam. Although

---

no difference to our analysis, we assume, favorably to Montany, that McNeil instructed her to hold on to a gait belt during the transfer.

- 3 -

Montany maintained a 3.07 GPA that semester, the SDC nonetheless voted to dismiss Montany from the program. The program director agreed, and, accordingly, Montany was dismissed from the program.

Montany responded by filing suit against UNE and McNeil. She asserted a negligence claim against both defendants and a breach-of-contract claim against UNE. Montany timely appealed from the district court's entry of summary judgment on both claims.

**ANALYSIS**

On appeal, Montany argues that the district court[3] erred in entering summary judgment for defendants on both of her claims. We address each claim in turn.

**A. Negligence**

In her complaint, Montany alleged that the practice of feigning falls in a practical exam — which, according to Montany, McNeil did during Montany's practical exam (and, to a lesser extent, during another one of Montany's practical exams in the prior semester) — is "a procedure known by the medical community to be dangerous." "Lifting or bearing the dead weight of a patient," Montany's complaint alleged, "is known to be a frequent cause of injury to health care providers. Therefore, the practice

---

[3] We view things institutionally and use "the district court" to refer to both the magistrate judge who issued a report and recommendation (R&R) and the district-court judge who adopted the R&R in its entirety.

engaged in by defendant McNeil . . . was negligent in that it placed an unreasonable risk of injury upon the plaintiff." Montany further alleged that McNeil's conduct during the practical exam in which she suffered a lasting back injury "was unreasonable and a lack of ordinary care" and that McNeil's weight "was more tha[n] [Montany] should have been required to bear."

After discovery was complete, the district court entered summary judgment in defendants' favor on Montany's negligence claim. Reasoning that "[t]he circumstances of the practical exam at issue were particular to the program of study of occupational therapy conducted by UNE" and that "the negligence and its harmful results to [Montany] are not so obvious in this case as to lie within a jury's common knowledge," the court concluded that expert testimony was required to establish defendants' breach of the standard of care. The court explained:

> Whether a student studying occupational therapy is required to move patients heavier than herself as part of the job duties for which she is being trained, whether she must demonstrate at [Montany's] stage of her training at the time of the practical exam at issue that she knows how to do this without coaching from an instructor or supervisor, and whether an instructor acting as a patient in such an exam may reasonably act in the manner described by [Montany] are all questions that are not within an average juror's common sense, knowledge, or experience.

Because Montany had failed to designate such an expert, the district court granted defendants summary judgment on her negligence claim.

On appeal, Montany argues that expert testimony was not required to establish McNeil's breach of the standard of care. Montany insists that, to the contrary, McNeil's actions — instructing Montany to hold on to a gait belt and then dropping his weight during the practical exam — were "non-technical" and went "against common sense and the ordinary standard of care." As a fallback, Montany argues that, even if expert testimony would ordinarily be required in this context, it is not required in this case because "the negligence and harmful results [were] sufficiently obvious as to lie within common knowledge." (Quoting Cyr v. Giesen, 108 A.2d 316, 318 (Me. 1954).) We disagree.

Under Maine law,[4] there are four elements of a negligence claim: "duty, breach, causation, and damages." Maravell v. R.J. Grondin & Sons, 914 A.2d 709, 712 (Me. 2007) (quoting Maddocks v. Whitcomb, 896 A.2d 265, 268 (Me. 2006)). "In determining the nature of the appropriate standard of care or practice, expert testimony may be necessary 'where the matter in issue is within the knowledge of experts only, and not within the common knowledge of lay[persons].'" Id. at 712-13 (alteration in original) (quoting Cyr, 108 A.2d at 318). The Maine Supreme Judicial Court, sitting as the Law Court (Law Court), has held that expert testimony is

_____

[4] The parties agree that Maine law governs this diversity case.

- 6 -

ordinarily required to establish the duty and breach elements in a negligence action against a physician or surgeon, see Cyr, 108 A.2d at 318, a dentist, see Welch v. McCarthy, 677 A.2d 1066, 1067, 1069 (Me. 1996), an attorney, see Pawlendzio v. Haddow, 148 A.3d 713, 715 (Me. 2016), a professional engineer, see Seven Tree Manor, Inc. v. Kallberg, 688 A.2d 916, 917-18 (Me. 1997), a college athletic trainer, see Searles v. Trs. of St. Joseph's Coll., 695 A.2d 1206, 1210 (Me. 1997), and a general contractor supervising a blasting contractor, see Maravell, 914 A.2d at 713. As the Law Court has observed, requiring expert testimony in such circumstances protects against "the potential danger that a jury, composed of laymen and gifted with the benefit of hindsight, will divine the breach of a[n] . . . obligation largely on the basis of the unfortunate result." Woolley v. Henderson, 418 A.2d 1123, 1131 (Me. 1980).

We reject Montany's contention that an expert is not generally required to establish the standard of care for what is reasonable conduct in a practical exam in an occupational-therapy program and the breach of that standard of care. Montany admits that "[a] practical exam requires that a student properly manage a patient in need of occupational therapy," and McNeil testified that practical exams are designed to test students' abilities to demonstrate proper mastery of transfer mechanics. The question of whether a practical exam tests those mechanics in an unreasonable

- 7 -

fashion is "not within the common knowledge of lay[persons]" and instead lies "within the knowledge of experts only." Maravell, 914 A.2d at 712-13 (alteration in original) (quoting Cyr, 108 A.2d at 318). Indeed, Montany concedes that her negligence claim involves the question "whether an instructor acting as a patient in [a practical] exam 'may reasonably act in the manner described by [Montany].'" Answering that question requires more than the jury's common sense, knowledge, and experience; it requires expert testimony separating the reasonable actions of an occupational-therapy instructor administering a practical exam to a graduate student from those that breach the standard of care.[5]

Of course, even in those circumstances where expert testimony is ordinarily required to establish breach of the standard of care, such testimony is not required "where the negligence and harmful results are sufficiently obvious as to lie within common knowledge." Id. at 713; see also Downer v. Veilleux, 322 A.2d 82, 84 (Me. 1974) (explaining that this exception applies "where the negligence and the harmful results are so glaringly apparent as to lie within the common knowledge of laymen"); cf.

---

[5] Montany's complaint confirms this conclusion. Although she alleged that McNeil's conduct during the practical exam "was unreasonable and a lack of ordinary care," she also alleged that the practice of feigning falls is "a procedure known by the medical community to be dangerous" and that "[l]ifting or bearing the dead weight of a patient is known to be a frequent cause of injury to health care providers." (Emphasis added.)

Michaud v. Blue Hill Mem'l Hosp., 942 A.2d 686, 688 (Me. 2008) ("Except in unusual circumstances, not existing here, a plaintiff in a medical malpractice case must prove the nature and scope of the defendants' duty by expert medical testimony." (emphasis added)). Montany attempts to bring her case within this exception, but we are unpersuaded.

The two cases upon which Montany primarily relies do not support her position that expert testimony was not required in this case. Montany principally relies on Searles, but that case offers her no assistance. In Searles, the Law Court held that, while "establishing the standard of care for [athletic trainers] in their treatment of athletes ordinarily requires expert testimony," 695 A.2d at 1210, no expert testimony was required in the circumstances of that case, which involved a negligence action brought by a college basketball player who suffered knee injuries, id. at 1208, 1210-11. The basketball player's claim against the athletic trainer "involve[d] more than a claim that [the athletic trainer] negligently conducted a course of treatment of [the player's] injuries that contributed to a worsening of his condition, or that he failed to appreciate the seriousness of [the player's] condition." Id. at 1210-11. Instead, the claim was that the athletic trainer, despite knowing of the acuteness of the player's injuries, failed to notify the basketball coach that the player should not have played basketball and failed to communicate

- 9 -

to the coach the nature and extent of the player's injuries.  Id. at 1211.  The court reasoned that "[j]urors could apply their common knowledge in determining whether such failures, if they occurred, constituted a breach by [the athletic trainer] of his duty to exercise reasonable care for the health and safety of [the player]."  Id.

But Montany's case is not cut from the same cloth.  She alleges that McNeil's weight drop during the practical exam was unreasonable.  Assessing the reasonableness of that conduct — which indisputably occurred during the course of a practical exam in an occupational-therapy graduate-degree program — is not a matter within the common knowledge of lay jurors.  Instead, it is a matter of professional judgment about the appropriate manner in which to test occupational-therapy graduate students on mobility-transfer mechanics.  Indeed, Searles actually supports the district court's conclusion that an expert was required in this case.  As the Law Court recognized in Searles, "the standard of care applicable to an athletic trainer who treats physical injuries or who must make judgments about the severity of a physical condition does not ordinarily lend itself to common knowledge."  Id. at 1210.  The same is true for the standard of care in this case, which hinges on a professional-judgment call about the appropriate manner to test graduate students in a practical exam administered as part of an occupational-therapy program.

- 10 -

The other case on which Montany relies, <u>Walter</u> v. <u>Wal-Mart Stores, Inc.</u>, 748 A.2d 961 (Me. 2000), is also of no assistance to her. In that case, the defendant pharmacist gave the plaintiff the wrong medication, <u>id.</u> at 964-65, and he admitted that he failed to follow the pharmacy's four-step process utilized to check for errors, <u>id.</u> at 967. The Law Court held that expert testimony was not required to establish the pharmacist's breach of the standard of care because "[t]he negligence of the pharmacist and the harmful results were sufficiently obvious to be within the common knowledge of a lay person. It does not take an expert to know that filling a prescription with the wrong drug and failing to take the steps in place in that pharmacy to check for the wrong drug is negligence." <u>Id.</u> at 972. Unlike a pharmacist's failure to dispense the correct medication, however, McNeil's alleged negligence — a purposeful weight drop during a practical exam testing students' abilities to demonstrate proper transfer mechanics in an occupational-therapy graduate-degree program — and its harmful effects are not sufficiently obvious to be within the common knowledge of a lay person. Expert testimony, therefore, was required to establish McNeil's breach of the standard of care.[6]

_____

[6] Montany's reliance on <u>Laing</u> v. <u>Clair Car Connection</u>, No. Civ. A. CV-01-516, 2003 WL 1669624, at *4 (Me. Super. Ct. Jan. 29, 2003), is also misplaced. The plaintiff's pertinent claims in <u>Laing</u> were for negligent misrepresentation and breach of contract, and the Superior Court rejected the car dealer's argument that "expert testimony is required to establish one's duty not to

- 11 -

At oral argument, Montany offered an additional reason why, in her view, her negligence claim does not require expert testimony: According to Montany, McNeil testified in his deposition that an intentional weight drop "wasn't part of the test."[7] But this contention made its debut at oral argument, so we need not — and therefore do not — consider it. See United States v. Hogan, 722 F.3d 55, 61 (1st Cir. 2013) (holding that appellant waived arguments raised for first time at oral argument).

As a last gasp, Montany attempts to paper over her own failure to obtain an expert by noting that "[d]efendants presented

negligently misrepresent facts or breach a contract." Id. Similarly, to the extent Montany intended to rely on Seider v. Board of Examiners of Psychologists, 754 A.2d 986 (Me. 2000), it provides her no support. In that case — which arose from the decision of the Board of Examiners of Psychologists (Board) that found that the plaintiff, a psychologist, violated the code of conduct governing her profession — the Law Court rejected the argument that the Board was required, as a matter of procedural due process, to establish the standard of care through expert testimony because (among other reasons) "it is well within the realm of common knowledge that a complete failure to act in accordance with provisions of the code of conduct established for one's profession constitutes a violation, and that violations of numerous provisions of that code may constitute negligence." Id. at 992.

[7] It appears that what McNeil actually said in his deposition was less definitive than Montany lets on. From our review of the deposition transcript (Montany has not pointed us to where in the record this statement appears), the closest thing we can find in McNeil's testimony is where he stated: "Shift my weight unexpectedly, throw my arms in the air unexpectedly, I — that doesn't sound like what happens in a practical exam." In any event, because Montany failed to raise this argument to this court until oral argument, we need not dwell on whether Montany's characterization of McNeil's testimony is accurate.

- 12 -

no evidence of any specialized circumstances that preclude a jury from understanding what happened." But she cites no case — let alone a Maine case — for the proposition that a defendant in a negligence action is under any burden to come forward with record evidence demonstrating that an expert is required to establish the standard of care and its breach.[8] Montany, the plaintiff in this action, bore the burden of establishing the prima facie elements of her negligence claim, see Maravell, 914 A.2d at 712, and, for reasons already explained, we are convinced — based on the undisputed fact that her negligence claim against an occupational-therapist instructor alleges that he acted unreasonably in the course of administering a practical exam to a graduate student in the occupational-therapy master's degree program — that, to satisfy this burden, she needed to come forward with expert testimony to establish the standard of care and its breach. Because expert testimony was required to establish McNeil's breach of the standard of care and Montany failed to adduce such evidence, summary judgment in defendants' favor was appropriate on her negligence claim. See Pawlendzio, 148 A.3d at 715-16 (affirming

---

[8] The Law Court's decision in Seven Tree Manor, which Montany references in passing in connection with this argument, imposes no such obligation. In that case, the Law Court instructed the parties to brief the issue of the need for expert testimony to establish breach of the standard of care owed by professional engineers and both parties agreed that such testimony should ordinarily be required. Seven Tree Manor, 688 A.2d at 917-18.

entry of summary judgment on legal-malpractice claim based on plaintiffs' failure to produce expert-based evidence); Michaud, 942 A.2d at 688 (same in medical-malpractice case).

## B. Breach of Contract

In her brief before us, Montany's characterization of her contract claim is a bit of a moving target. At certain points in her brief, Montany seems to rely on the UNE student handbook as the basis for her contract claim. At other points in her brief, Montany seems to suggest that her breach-of-contract claim is grounded, at least in part, in the SDC plan. Finally, at still other points in her brief, Montany characterizes her contract claim as one for UNE's breach of either "the implied promise of good faith and fair dealing" or the duty "not to act in an arbitrary manner and in bad faith toward the student." We address each characterization in turn.

## 1. Handbook

In her complaint, Montany alleged that "[t]here existed between [Montany] and UNE a contract the terms of which were the provision of the [s]tudent [h]andbook." Montany argues that the district court "ignore[d] the claim of breach of contract based upon the [s]tudent [h]andbook."

But it did no such thing. Rather, the district court recognized that "[t]he contract claim asserted in the complaint is based on the student handbook" but noted that, when confronted

- 14 -

with defendants' argument that they were entitled to summary judgment on a breach-of-contract claim arising from the student handbook, Montany eschewed reliance on the handbook, "apparently abandoned" it as a basis for her contract claim, and instead "respond[ed] that her claim based on the [SDC plan] remains viable, as well as a claim, apparently based on an implied contract, that the defendants acted unfairly, arbitrarily, and/or capriciously."[9]

Defendants argue that Montany's failure to put forth any argument in her opposition to defendants' motion for summary judgment to the effect that UNE breached a provision of the student handbook constitutes abandonment of any such claim. Having read Montany's opposition, we agree. See Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995) (recognizing that "an issue raised in the complaint but ignored at summary judgment may be deemed waived"); see also Vélez-Vélez v. P.R. Highway & Transp. Auth., 795 F.3d 230, 238 (1st Cir. 2015) (concluding that plaintiff failed to preserve arguments relating to entry of summary judgment on one claim where plaintiff failed to address, beyond mere one-sentence cursory assertion, that claim in her opposition to summary-judgment motion); Merrimon v. Unum Life Ins. Co. of Am.,

---

[9] The district court similarly remarked that Montany's "summary judgment presentation on the merits of her contract claim is based entirely upon the alleged 'specific contractual promise' inherent in the ' . . . SDC Plan.'"

- 15 -

758 F.3d 46, 57 (1st Cir. 2014) ("After filing their complaint, the plaintiffs did nothing to develop this particular claim, and the summary judgment papers disclose no development of it. The claim is, therefore, waived.").[10]

## 2. SDC Plan

The district court concluded that Montany's "complaint cannot reasonably be read to include . . . a contract claim based on the [SDC plan]," and it refused to allow her to amend her complaint through argument in her opposition to defendants' motion for summary judgment. See Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 53 (1st Cir. 2011) (quoting Gilmour v. Gates, McDonald & Co.,

---

[10] We note that, even if she hadn't abandoned this claim, it's far from clear that Montany could state a contract claim based on the provisions of the student handbook. The handbook provides that its "provisions . . . do not constitute a contract, express or implied, between [UNE] and any applicant, student's family or faculty or staff member" and that UNE "reserves the right to change the policies, procedures, rules, regulations, and information in this handbook at any time." Under Maine law, a student handbook using language such as this cannot alone form the basis of a breach-of-contract claim. See Millien v. Colby Coll., 874 A.2d 397, 400, 402 (Me. 2005) (affirming trial court's conclusion that student handbook — which contained "a reservation clause that g[ave] [the college] the right to unilaterally alter the terms of the handbook without notice to students" — "was not a binding contract or the exclusive source of the terms of the parties' agreement" because, "[u]nder Maine law, 'a reservation to either party of an unlimited right to determine the nature and extent of his performance renders his obligation too indefinite for legal enforcement, making it, as it is termed, merely illusory'" (quoting Corthell v. Summit Thread Co., 167 A. 79, 81 (Me. 1933))).

382 F.3d 1312, 1315 (11th Cir. 2004), for the proposition that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment"). We agree that Montany's complaint cannot be read as asserting such a claim; indeed, the SDC plan is not even mentioned in the complaint.

On appeal, Montany has not offered a coherent and developed argument challenging the ground on which the district court entered summary judgment on any breach-of-contract claim premised on the SDC plan. First, she argues that the SDC "plan is not a separate contract; it is part and parcel of the contract between UNE and . . . Montany that is based upon the [s]tudent [h]andbook, and which carries with it an implied obligation of good faith and fair dealing in all interactions between UNE and its students." Second, Montany observes that "university/student contracts mostly 'involve written materials, usually student handbooks'" and notes that the SDC "plan presented by UNE to Montany, setting forth the requirements for her continuation at UNE, and produced by UNE in discovery, is a writing, and part and parcel of a larger contractual obligation."

But, notwithstanding these passing observations, Montany has failed to meaningfully develop any argument that the district court erred in entering summary judgment on any breach-of-contract claim premised on the SDC plan since such a claim was never alleged in her complaint; accordingly, we need not consider any such

undeveloped argument.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); see also Town of Norwood v. Fed. Energy Regulatory Comm'n, 202 F.3d 392, 405 (1st Cir. 2000) ("[D]eveloping a sustained argument out of . . . legal precedents is the job of the appellant, not the reviewing court, as we have previously warned.").

### 3. Good Faith/Arbitrariness

In her complaint, Montany alleges that (1) UNE undertook an obligation to "deal with her in good faith and fairly" and to not "act arbitrarily and in bad faith"; (2) she "relied on UNE's promise of good faith and fair dealing, and that she would not be treated in bad faith and arbitrarily"; and (3) UNE "did not act in good faith and did not deal fairly with plaintiff."

But, to the extent she means to assert a claim for UNE's breach of the implied obligation of good faith and fair dealing, she cannot do so because, as the district court correctly concluded, Maine has confined this duty to insurance contracts and contracts governed by the Uniform Commercial Code (U.C.C.).  See Wortley v. Camplin, 333 F.3d 284, 293 (1st Cir. 2003) ("Maine law does not impose a duty of good faith and fair dealing except in circumstances governed by specific provisions of the U.C.C."); Me. Farms Venison, Inc. v. Peerless Ins. Co., 853 A.2d 767, 770 (Me.

- 18 -

2004) ("We have held that 'in every insurance contract an insurer owes a duty to act in good faith and deal fairly with its insured' in the handling of insurance claims." (quoting Marquis v. Farm Family Mut. Ins. Co., 628 A.2d 644, 648 (Me. 1993))); Haines v. Great N. Paper, Inc., 808 A.2d 1246, 1250 (Me. 2002) ("We have declined to impose a duty of good faith and fair dealing except in circumstances governed by specific provisions of the Uniform Commercial Code."); Niedojadlo v. Cent. Me. Moving & Storage Co., 715 A.2d 934, 937 (Me. 1998) ("We have had the opportunity to extend the implied covenant of objective good faith in contracts not governed by Maine's U.C.C. and we have specifically refused to do so. We decline the invitation to do so today." (internal citations omitted)).

Perhaps in recognition of this hurdle, Montany's reply brief distinguishes the "duty of good faith and fair dealing" that "some states attach . . . to various commercial contracts" from her allegation that UNE breached "a stand-alone duty" to avoid arbitrary and capricious conduct and to "meet[] common standards of fair play, meet[] the student's reasonable expectations, and provide[] fundamental fairness." And, according to Montany, a jury should decide whether UNE acted arbitrarily and in a fundamentally unfair manner when it promulgated the SDC plan — a plan that (in Montany's words) "surely could justify Montany's reasonable expectation that she would be allowed to return to UNE

- 19 -

and complete her occupational therapy training if she complied with" it — but failed to honor it.

But it is not at all clear — despite Montany's protestations to the contrary — that Maine imposes any such duty on private universities. The primary authority upon which Montany relies for the existence of this duty is a decision of the Maine Superior Court, Millien v. Colby Coll., No. Civ. A CV-02-261, 2003 WL 22100833 (Me. Super. Ct. Aug. 14, 2003). Relying on Goodman v. President & Trustees of Bowdoin College, 135 F. Supp. 2d 40, 54 (D. Me. 2001), the Superior Court concluded in Millien that: (1) "a contractual relationship [between the college and the student] probably exist[ed]," Millien, 2003 WL 22100833, at *2; (2) "[t]o the extent that there is a contractual relationship between the college and its students with regard to disciplinary proceedings, the school's responsibility would be to provide a process which meets common standards of fair play, meets the student's reasonable expectations[,] and provides fundamental fairness," id. at *3; and (3) in any event, the college did not breach any contractual obligation in that case, id. at *3.

The student appealed, and the Law Court affirmed. Millien, 874 A.2d at 400. Because the college did not file a cross-appeal challenging the Superior Court's finding that a contractual relationship existed between the parties, the Law Court accepted this finding and affirmed the lower court's

conclusion that the college's conduct did not constitute a breach of contract. Id. at 401-02 & nn.2-3. Notably, the student urged the Law Court to adopt language from Goodman — the very same language that Montany relies on in this case — but it declined to do so: "Because we affirm the trial court's finding regarding the contractual relationship between [the student] and [the college] under the facts of this case, we see no need to adopt a fixed standard or standards governing the contractual relationship between students and private colleges or universities." Id. at 401 n.2. Since Millien, Maine's highest court has not addressed whether and to what extent a contractual relationship exists between students and private colleges or universities.

Now Montany — who elected to bring this diversity action in federal court instead of Maine state court — asks us to adopt the very same "fixed standard or standards" that the Law Court declined to adopt in Millien. But the cases upon which she relies shed little light on whether the Law Court would hold that a private university has the contractual relationship with students that Montany alleges,[11] and, in light of Millien, we are hesitant

---

[11] In addition to the Maine Superior Court decision in Millien and the language from Goodman that the Law Court declined to adopt in Millien, Montany relies on two decisions from the United States District Court for the District of Maine — both of which predate the Law Court's decision in Millien and involved situations where the university did not contest that a contractual relationship existed, see Gomes v. Univ. of Me. Sys., 304 F. Supp. 2d 117, 130 (D. Me. 2004); Tobin v. Univ. of Me. Sys., 59 F. Supp. 2d 87, 95

to conclude that it would.  After all, "we are reluctant to push state law to new frontiers in a plaintiff-elected diversity action where the state's [highest court] has evinced reluctance to take the approach the diversity plaintiff proposes."  Kelly v. Marcantonio, 187 F.3d 192, 199 (1st Cir. 1999).  Montany's breach-of-contract theory "should have been directed to the state courts in the first instance."  Id. at 198-99.  In the absence of authority persuading us that such a contractual relationship exists under Maine law, "we find no basis for [this aspect of Montany's contract] claim."  Nicolaci v. Anapol, 387 F.3d 21, 27 (1st Cir. 2004) (declining to recognize cause of action for common-law indemnification under Massachusetts law where, as diversity plaintiffs conceded, Massachusetts had never extended doctrine to scenario of plaintiffs' case and cases cited by plaintiffs did not support such extension).  Therefore, summary judgment was appropriate on this aspect of Montany's breach-of-contract claim.[12]

_____

(D. Me. 1999) — and four decisions of this court — all but one of which also predate Millien and all of which, in any event, apply the substantive law of a state other than Maine, see Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34-35 (1st Cir. 2007) (applying Rhode Island law, which recognizes "that parties to a contract act pursuant to an implied duty of good faith and fair dealing"); Mangla v. Brown Univ., 135 F.3d 80, 83, 84 (1st Cir. 1998) (same); Russell v. Salve Regina Coll., 890 F.2d 484, 487, 488 (1st Cir. 1989), rev'd 499 U.S. 225 (1991) (same); Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 724-25 (1st Cir. 1983) (applying Massachusetts law).

    [12] Although the district court did not enter summary judgment on this aspect of Montany's breach-of-contract claim on this

## CONCLUSION

For these reasons, we affirm the entry of summary judgment in defendants' favor on Montany's negligence and breach-of-contract claims.[13]  Each side shall bear its own costs.

---

precise ground, we are free to affirm the entry of summary judgment on any ground apparent from the record.  See Delgado Echevarría v. AstraZeneca Pharm. LP, No. 15-2232, 2017 WL 1593474, at *3 (1st Cir. May 2, 2017).

[13] We need not — and therefore do not — address UNE's argument that the district court could have entered summary judgment on Montany's breach-of-contract claim on the ground that she failed to exhaust her internal remedies by failing to appeal her dismissal to the Dean of UNE.